# EXHIBIT 1

# THE MARSH LAW FIRM PLLC

PO Box 4668 #65135

New York, New York 10163-4668

Phone (212) 372-3030 / Fax (914) 206-3998 / VNS@MarshLaw.net

October 27, 2009

The Honorable Leonard Davis
United States District Court
Eastern District of Texas
211 W Ferguson Third Fl
Tyler, TX 75702-7200

Re:     ***United States v. Doyle Randall Paroline***

Dear Judge Davis,

I am the attorney for Amy, the victim in the Misty child pornography series. Amy is hereby requesting restitution in accordance with the Mandatory Restitution for Sex Crimes section of the Violence Against Women Act of 1994 (VAWA) [18 U.S.C. 2259] from every criminal defendant who receives, distributes or possesses her images.

On July 9, 2009, Senior United States District Court Judge Lacey A. Collier in the Northern District of Florida entered the first ever restitution order against a criminal defendant who was not directly involved in producing the pornography depicting the victim. Judge Collier's order imposed restitution in the amount of $3,263,758 due and payable immediately to Amy. The defendant in the case, who is indigent, is expected to appeal to the Eleventh Circuit. Since then, Judge K. Michael Moore in the Southern District of Florida awarded $$3,680,153 in restitution to Amy in a case where the defendant possessed her child pornography images.

The VAWA provisions require each defendant to pay Amy the "full amount" of her losses. Under the Act, the term "full amount of the victim's losses" includes any costs incurred for:

(A)     medical services relating to physical, psychiatric, or psychological care;
(B)     physical and occupational therapy or rehabilitation;
(C)     necessary transportation, temporary housing, and child care expenses;
(D)     lost income;
(E)     attorneys' fees, as well as other costs incurred; and
(F)     any other losses suffered by the victim as a proximate result of the offense.

This list is not exclusive since the primary goal of restitution under 18 U.S.C. 2259 is to award the full amount of the victim's losses regardless of how the losses are categorized.

The attached documents are incorporated into this request:

1. Victim Impact Statement of Amy – The Victim in the Misty Series;
2. Report of Psychological Consultation by Joyanna Silberg, Ph.D. dated November 21, 2008;
3. Letter Calculating the Value of Certain Losses by the Smith Economics Group, Ltd. dated September 15, 2008;

## **Introduction**

When she was eight and nine years old, Amy was repeatedly raped and sexually exploited in order to produce child pornography.[1] Her abuse images depict rape, cunnilingus, fellatio and digital penetration. Amy was also forced to actively participate in her exploitation and abuse by performing sex acts over the telephone and computer for other pedophiles; being asked to solicit friends to join her in sex acts; and being taken into the woods to meet other pedophiles. Most if not all of this activity was for the purpose of producing the child pornography possessed and distributed by the Defendant in this case.

According to Amy's forensic psychologist, Dr. Joyanna Silberg, Amy faces a long and difficult course of treatment for post traumatic stress disorder:

> These post traumatic symptoms and effects of sexual abuse are more resistant to treatment than those that would normally follow a time limited trauma, as her awareness of the continued existence of the pictures and their criminal use in a widespread way leads to an activation in these symptoms. . . .

> . . . As noted by Klain, Davies and Hicks (2001) "Child victims of pornography face a lifetime of victimization because the pornography can be distributed indefinitely." . . .

> Feelings of shame and humiliation are some of the worst affective reactions to treat in victims of sexual abuse. These feelings of shame and humiliation are multiplied exponentially for victims of Internet child pornography. Anonymity is something we offer victims of sexual crimes with acknowledgment that they deserve this protection of privacy. Yet, knowing one's image is out there at all

---

[1] "In the context of children . . . there can be no question of consent, and use of the word pornography may effectively allow us to distance ourselves from the material's true nature. A preferred term is abuse images and this term is increasingly gaining acceptance among professionals working in this area. Using the term abuse images accurately describes the process and product of taking indecent and sexualized pictures of children, and its use is, on the whole, to be supported." Sharon W. Cooper, et. al., *Medical, Legal, & Social Science Aspect of Child Sexual Exploitation* p. 258 (2005).

times is an invasion of privacy of the highest degree which makes the victim feel known, revealed and publicly shamed, rather than anonymous. . . .

The ongoing awareness that the pictures are out there interferes significantly with the therapeutic resolution of these problems, as she lives in an enduring state of feeling that she can never really escape or get away from abuse.

For these reasons, the re-victimization of Amy through the trading of her images on the Internet is the source of enduring trauma that will have lasting effects on her and the symptoms she displays are particularly resistant to standard treatment for post-traumatic stress and the effects of sexual abuse.

. . . It is expected that she will continue to struggle with the enduring effects of these traumatic experiences as described above over her lifetime. She will require weekly therapy, and it is likely there will be periods where more intensive inpatient treatment or rehabilitation services will be required over the course of her lifetime.

Silberg, *Psychological Consultation* pp. 8-10.

Scientific research and established legal precedence support Dr. Silberg's conclusions. Dr. Mimi Halper Silbert discovered that the long-term effects on child pornography victims of being photographed were more debilitating than any short-term or medium-term effects and that these effects are compounded when children are involved in more than one form of sexual exploitation. These ill-effects may be exacerbated by the knowledge that others may see or distribute the images. Dolf Zillmann & Jennings Bryant, *Pornography: Research Advances and Policy Considerations* p. 215 (1989).

In the landmark case of *New York v. Ferber*, 458 U.S. 747 (1982), the Supreme Court found that:

[t]he use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole. It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. . . .

Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child

pornography. . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions.

*Id.* at pp. 758-760 nn. 9, 10. See also *U.S. v. Sherman*, 268 F.3d 539 (7th Cir. 2001) (the children depicted in the pornography suffer a direct and primary emotional harm when another person possesses, receives or distributes the material); *U.S. v. Knox*, 32 F.3d 733 (3rd Cir. 1994) (child pornography is an affront to the dignity and privacy of the child and an exploitation of the child's vulnerability); *U.S. v. Andersson*, 803 F.2d 903 (7th Cir. 1986) (the harm inflicted on these children is two-fold: the sexual abuse when the film or photograph is initially produced . . . and the harm continues when these photographs and films are distributed).

"Whatever the complexities, it is quite clear that the production of abusive images of children feeds, sustains, and generates sexual exploitation of children. . . . There are no good and bad offenders with respect to the trade of abuse images of children." Sharon W. Cooper, et. al., *Medical, Legal, & Social Science Aspect of Child Sexual Exploitation* p. 273 (2005).[2] A recent *New York Times* review of the Parisian exhibition "Controversies: A Legal and Ethical History of Photography" surmised that "there is a civil contract implied by photographs. . . . shooting pictures of people is a sort of violation . . . if sensitivity is lacking, there can be something barbaric about it." The article continues, "[w]e, viewing the pictures, are complicit. As consumers of images we bear witness through them. Or we're voyeurs. In either case we complete a transaction that we instigated, in that a photograph is made hoping someone will look at it. It's a message tossed into the ocean of time, and how we read that message, whether indifferently or with compassion, can have moral dimensions."[3]

### Amy is the Victim of the Defendant's Crimes

Child pornography is largely distributed by loosely organized networks of anonymous pedophiles and members of other deviant subcultures utilizing a variety of Internet technologies. The individuals who trade and receive child pornography do not know each other which enables them to conduct their illegal activities with impunity and little risk of discovery. Given the nature of the child pornography trade, these networks comprise a concerted and coordinated group effort to perpetrate the

---

[2] Dr. Cooper has been retained by Amy as a consulting expert.

[3] Michael Kimmelman, *When a Picture Is Worth a Thousand Debates, Give or Take*, N.Y. Times (06-03-2009) http://tinyurl.com/NYTcontroversies: Years ago Susan Sontag recalled her first sight, at 12, of the pictures taken by British soldiers arriving at Bergen-Belsen. "When I looked at those photographs, something broke," she wrote in "On Photography." "Some limit had been reached, and not only that of horror. I felt irrevocably grieved, wounded, but a part of my feelings started to tighten; something went dead; something is still crying. To suffer is one thing; another thing is living with the photographed images of suffering, which does not necessarily strengthen conscience and the ability to be compassionate. It can also corrupt them." *Id.*

production and distribution of child pornography worldwide and the associated sexual victimization of children.[4] The Defendant in this case was one such member of this group. See Philip Jenkins, *Beyond Tolerance: Child Pornography on the Internet*. New York: NYU Press, 2001.

The courts of appeal have consistently and repeatedly held that the primary victims of child pornography possession, receipt, distribution and production are the children depicted in the pornographic materials.

In *United States v. Ketcham*, 80 F.3d 789 (3rd Cir. 1996), the Third Circuit held that "the primary victims that Congress had in mind when it enacted 18 U.S.C. 2252(a) were the children depicted in pornographic materials." Similarly in *United States v. Hibbler*, 159 F.3d 233 (6th Cir. 1998), the Sixth Circuit concluded that "the child pornographer, quite simply, directly victimizes the children pictured in such materials. . . . It is the children depicted in the child pornography distributed and possessed by defendant who are the primary victims of the crimes of which he was convicted."

In *United States v. Davis*, 204 F.3d 1064 (11th Cir. 1999), the Eleventh Circuit explained that "the harm resulting from possession of child pornography occurs when one sustains a market for such pictures. . . . Therefore, it is not necessary for one to derive any benefit from the child pornography or actively solicit the pornography, provided one's actions play a role in the distribution network."

In *United States v. Boos*, 127 F.3d 1207 (9th Cir. 1997), the Ninth Circuit noted that "the harm caused by the distribution of child pornography is concentrated. It is visited upon a single individual or discrete group of individuals, namely, the child or children used in the production of the pornographic material." The Court reasoned:

---

[4] A recently reported study of individuals incarcerated for possession, receipt and distribution of child pornography found that these offenders were significantly more likely than not to have sexually abused a child via a hands-on act. The study's authors suggest that online criminal investigations, while targeting so-called "Internet sex offenders," likely have resulted in the apprehension of concomitant child molesters. Upon being discovered these offenders tend to minimize their behavior. They may attribute their search for child pornography to "curiosity" or a similar benign motivation. They may "accept responsibility" only for those behaviors that are already known to law enforcement, but hide any contact sexual crimes to avoid prosecution for these offenses, or to avoid the shame and humiliation that would result from revealing their deviance to family, friends, and community. Only later do the majority of sex offenders who enter treatment acknowledge that they were not, as they initially claimed, merely interested in sexual images involving children; they were, and are, sexually aroused by children. Further, as prior research and the current findings suggest, it appears that the manifestations of their deviant sexual arousal was not limited to fantasy. Rather, when an opportunity arose either incidentally or as a result of planned predatory efforts many offenders molested or raped children and engaged in a variety of other sexually deviant behaviors. Michael L. Bourke & Andres E. Hernandez, *The 'Butner Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders.* Journal of Family Violence (2009) 24:183–191.

> it seems to us scarcely debatable that the children depicted—many as young as 5 years old—were the primary "victims" of Boos's criminal conduct . . . After all, it was the children depicted . . . who were "injured" (both physically and psychologically) as a result of Boos's patronage of the porn industry, who were "sacrificed" to satisfy Boos's curiosities, who were "subjected" to the cruelest form of "oppression, hardship, [and] mistreatment" at the hands of pornography producers and photographers, and whose lives were quite possibly "destroyed" in the process.

*Id.* at p. 1210.

The *Boos* court also "categorically reject[ed] Boos's attempt to draw a fine-line distinction between the production of child pornography, which he concedes primarily injures the children involved, and the distribution of that pornography, which he claims does not have the same injurious effect." *Id.* at 1211 n. 1.

In *United States v. Norris*, 159 F.3d 926 (5th Cir. 1998), the defendant argued that "when he committed the crime of receiving child pornography, the children depicted were not 'victimized' by that act and therefore were not 'victims' for sentencing purposes. Under this theory the victimization of the children occurred at the time the pornographic images were produced. Therefore, according to Norris, the criminal act of simply receiving child pornography is a victimless crime, and the children depicted in the child pornography can only be victims of the crime of receiving child pornography in an indirect or secondary sense." *Id.* at p. 929.

The *Norris* court, like the *Boos* court, unequivocally rejected this reasoning finding that this was an "unrealistically narrow view" of the scope of harms experienced by child pornography victims, surmising that "[u]nfortunately, the victimization of the children involved does not end when the pornographer's camera is put away." *Id.* The court found that the consumer, or end recipient, of child pornography cause the children depicted in those materials to suffer in at least three ways:

> First, the simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials. "[T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." . . . The consumer who "merely" or "passively" receives or possesses child pornography directly contributes to this continuing victimization.

> Second, the mere existence of child pornography represents an invasion of the privacy of the child depicted. Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent.

The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient be considered to be invading the privacy of the children depicted, directly victimizing these children.

Third, the consumer of child pornography instigates the original production of child pornography by providing an economic motive for creating and distributing the materials. As Congress put it in explicit factual findings: "[T]he existence of and traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles, and child pornographers, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials[.]"

*Id.* at pp. 929-930 (internal citations removed).

The *Norris* court recognized that:

there is no sense in distinguishing . . . between the producers and the consumers of child pornography. Neither could exist without the other. The consumers of child pornography therefore victimize the children depicted in child pornography by enabling and supporting the continued production of child pornography, which entails continuous direct abuse and victimization of child subjects.

*Id.* at p. 930.

The court concluded that "the victimization of a child depicted in pornographic materials flows just as directly from the crime of knowingly receiving child pornography as it does from the arguably more culpable offenses of producing or distributing child pornography." *Id.*

Like the defendants in *Norris* and *Boos*, the defendant in *United States v. Tillmon*, 195 F.3d 640 (11th Cir. 1999) argued that "while the minor depicted was victimized when the photographs were taken, the interstate transportation of the photograph does not further harm that child." The Eleventh Circuit rejected this argument distinguishing between child pornography production and child pornography distribution:

Although an argument can be made that the production of child pornography may be more immediately harmful to the child involved, the dissemination of that material certainly exacerbates that harm, not only by constituting a continuing invasion of privacy but by providing the very market that led to the creation of the images in the first place. Thus, the children depicted remain the primary victims not only when the pictures are taken or purchased, but also

when they are subsequently transported or distributed from one person to another.

*Id.* at p. 644. The Court concluded that "the primary identifiable victim of the transportation of child pornography is the minor depicted in the image." *Id.* at p. 645.

#### <u>Amy is Entitled to the Full Amount of her Losses as Restitution</u>

As the "primary identifiable victim" in this case, Amy is entitled to criminal restitution. The primary goal of restitution under the Mandatory Restitution for Sex Crimes section of the Violence Against Women's Act of 1994 [18 U.S.C. 2259] is to award the full amount of the victim's losses regardless of how those losses are categorized.

The district court has substantial discretion over the entire process leading to a restitution order and in determining the amount of restitution. So long as the basis for reasonable approximation of a victim's loss is at hand, difficulties in achieving exact measurements will not preclude the district court from ordering restitution. *United States v. Savoie*, 985 F.2d 612 (1st Cir. 1993).

In *United States v. Julian*, 242 F.3d 1245 (10th Cir. 2001), the Tenth Circuit reviewed 18 U.S.C. 2259 and its application in child pornography cases:

We note that § 2259 and the other two mandatory restitution statutes associated with violence against women and children which were adopted at the same time, *see* 18 U.S.C. §§ 2248 & 2264, **are much broader than § 3663A** [the Mandatory Victims Restitution Act or MVRA]. . . . these three statutes use the terms "full amount of the victim's losses" for "any costs incurred" for physical, psychiatric, or psychological care, and also include restitution for "any other losses suffered by the victim as a proximate result of the offense."

*Id.* at p. 1247 (emphasis added). The court found that the legislative history of the VAWA statutes justified imposing mandatory restitution for psychological counseling:

Congress was well aware that children victimized by sexual abuse often do not recover quickly from their injuries. Indeed, the legislative history of the amended statutes prohibiting the use of children in pornography cites and quotes broadly from the landmark United States Supreme Court case of *New York v. Ferber*, 458 U.S. 747 (1982). In *Ferber*, the court extensively discussed the long-term serious physiological, emotional, and mental difficulties of children who have been sexually exploited:

The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole. It has been found that sexually exploited

children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.

. . . .

Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions.

*Ferber*, 458 U.S. at 758-60 nn. 9, 10.

*Id.* The *Julian* court concluded that "in discussing the rationale behind the mandatory restitution statutes, Congress noted the goal of criminal restitution: to ensure that the wrongdoer is required to the degree possible to restore the victim to his or her prior state of well being." *Id.*

In *United States v. Laney*, 189 F.3d 954 (9th Cir. 1999), the Ninth Circuit explained that "the language of the relevant statutes shows that Congress intended to allow district courts to include future counseling expenses in the amount of restitution under section 2259. Section 2259 is phrased in generous terms, in order to compensate the victims of sexual abuse for the care required to address the long term effects of their abuse. . . . Congress was well aware that children victimized by sexual abuse often do not recover quickly from their injuries." *Id.* at p. 966.

The court concluded that as long as the district court estimates the amounts that victims will spend on future counseling with reasonable certainty in accordance with the procedures set forth in 18 U.S.C. 3664, an award of restitution for future counseling expenses will be upheld.

In *United States v. Whitedirt*, 216 F.3d 1085, 2000 WL 377778 (9th Cir. 2000), the Ninth Circuit recognized that "a court may order mandatory restitution for amounts that victims have not yet spent." In a later case, *United States v. McKay*, 242 F.3d 384, 2000 WL 1517159 (9th Cir. 2000), the Ninth Circuit held that a district court may order restitution for the future counseling of a sexual abuse victim even though the costs of counseling have not yet been incurred and even when the victim is not already in therapy. *See also United States v. Pearson*, 2009 WL 1886055 (2nd Cir. 2009).

## Determining Mandatory Restitution

In awarding $309,280 in mandatory restitution, the court in _United States v. Danser_, 270 F.3d 451 (7th Cir. 2001) explained how such an amount is properly determined:

> In support of an award of this figure, the government, through a licensed actuary, determined that Karen Doe's life should last an additional 75 years. The government then multiplied the present costs of Karen's weekly [therapy] sessions ($78 per session) by her actuarially determined life expectancy to come up with $304,200.

_Id._ at p. 453 n. 1. The _Danser_ court found that "in enacting section 2259, it is clear that Congress intended to provide victims of sexual abuse with expansive relief for the full amount of . . . [their] losses suffered as a result of abuse. Congress chose unambiguously to use unqualified language in prescribing full restitution for victims." _Id._ at p. 455.

The district court has broad discretion in awarding restitution for "any other losses suffered by the victim as a proximate result of the offense." In _U.S. v. Estep_, 378 F.Supp.2d 763 n. 4 (E.D.Ky. 2005) the court awarded attorney's fees to the mother of one child victim for divorce proceedings against the perpetrator, rent payments and transportation expenses, in addition to past and future treatment and counseling costs. The court also awarded attorney's fees and costs for the victims' attorney who filed a civil case on their behalf.

In _United States v. Doe_, 488 F.3d 1154 (9th Cir. 2007), the Ninth Circuit upheld an award of restitution for trauma counseling and psychological care, case review by a social worker, quarterly medical check-ups, vocational training, formal schooling, and a management fee to a social services organization to coordinate services for numerous child victims.

The VAWA statute's use of the broad term "lost income" is distinct from other restitution provisions which limit recovery to "lost income . . . incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense" 18 U.S.C. 3663A(b)(4), or "lost income . . . related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense" 18 U.S.C. 3663(b)(4).

In 18 U.S.C. 3663A(b)(2)(c), which applies to an offense resulting in bodily injury to a victim, Congress provided for reimbursement for "income lost by such victim as a result of such offense." See _United States v. Oslund_, 453 F.3d 1048, 1062 (8th Cir. 2006) (when an offense causes bodily harm to a victim, restitution must be ordered for medical or psychological treatment, costs of therapy and rehabilitation, and 'income

lost by such victim as a result of such offense'); _U.S. v. Bedonie_, 317 F. Supp. 2d 1285 (D. Utah 2004) (there is no distinction between past and future income as both are lost "as a result of" the offense; in cases involving crimes of violence courts are required to award restitution for both past and future lost income).

In _U.S. v. Serawop_, 505 F3d 1112 (10th Cir. 2007), the Tenth Circuit held that "any victim suffering bodily injury or death necessarily incurs the income lost only after the injury, i.e. in the future, as a consequence of the defendant's violent act.  Moreover, the term "lost earnings," which is similar to "income lost," is defined by Black's Law Dictionary to include future earnings:

> 'lost earnings. Wages, salary, or other income that a person could have earned if he or she had not lost a job, suffered a disabling injury, or died. Lost earnings are typically awarded as damages in personal-injury and wrongful-termination cases. There can be past lost earnings and future lost earnings. Both are subsets of this category, though legal writers sometimes loosely use future earnings as a synonym for lost earnings.  Cf. LOST EARNING CAPACITY.' BLACK'S LAW DICTIONARY 526 (8th ed. 2004)"

_Id._ at p. 1121.

The Mandatory Victims Restitution Act of 1996, which amended and restructured several parts of the Mandatory Restitution for Sex Crimes section of VAWA, highlighted the importance of "emotional damages" as an essential component of restitution for victims of child pornography. Senate Report 104-179 emphasized that "no change is made to the scope of restitution required under the VAWA provisions, including the availability of emotional damages." Such damages are also known as non-economic compensatory damages and includes damages for what is commonly called "emotional distress."

Clearly, a victim's emotional distress is a foreseeable and proximate result of violating the federal child pornography laws. In 1946, the Supreme Court held in _Bell v. Hood_, 327 U.S. 678 (1946) that "federal courts may use any available remedy to make good the wrong done." Emotional damages are plainly a form of compensatory damages designed to "make good the wrong done" and fall within the scope of the "full amount of the victim's losses" as well as "losses suffered by the victim as a proximate result of the offense" allowed by the VAWA provisions.

In requiring that a victim recover the "full amount" of her losses, Congress also imposed joint and several liability on defendants. In _United States v. Erickson_, 83 Fed.Appx. 997 (10th Cir. 2003), the defendant argued that his restitution order was illegal because it included losses attributable to other defendants. The Tenth Circuit disagreed finding that the statute under which the defendant received his restitution

sentence, 18 U.S.C. 3664(h), states that "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution."

The *Erickson* court found that "the severe, collaborative abuse of this child was cumulative in effect and could not be apportioned to individual perpetrators of crimes against her." Concerning the defendant's crimes, the court of appeals agreed with the district court that "it is no defense for this defendant to say there were other partners; that there were other people who are complicit." *Id.* at p. 1000.

Like the victim in *Erickson*, Amy is also a victim who has experienced "severe, collaborative abuse" due to the widespread and almost unlimited distribution of her child pornography images by individuals including the Defendant in this case. For Amy, the fact that hundreds of criminal defendants have and continue to victimize her is neither a bar to recovery nor a basis for reducing recovery since "if the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution." 18 U.S.C. 3664(h). According to Amy's forensic psychologist, Dr. Joyanna Silberg, it is precisely because her images are so highly sought, traded and re-distributed that Amy's psychological injuries are so lasting and severe and difficult to treat.

The doctrine of joint and several liability reflected in 18 U.S.C. 3664 has a long history in the civil law. It is especially applicable in cases involving the distribution and possession of child pornography since, as the Supreme Court recognized in *Ferber*, "[t]he victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child. . . . Thus, distribution of the material violates the individual interest in avoiding disclosure of personal matters. . . . When such performances are recorded and distributed, the child's privacy interests are also invaded." *Ferber*, 458 U.S. at 758-760 nn. 9, 10.

As William L. Prosser recognized in his singular Handbook of the Law of Torts, when "there is a joint enterprise, and a mutual agency, so that the act of one is the act of all . . . liability for all that is done must be visited upon each. It follows that there is no logical basis upon which the jury may be permitted to apportion the damages." Wiliam L. Prosser, *Torts* p. 315 (4th ed. 1971).

The defendant in *United States v. Crandon*, 173 F.3d 122 (3rd Cir. 1999) pled guilty to one count of receiving child pornography. After considering the victim's unrebutted evidence, the Third Circuit held that "the statute requires the court to order restitution for the full amount of the victim's losses. There is nothing in the statute that provides for a proportionality analysis." *Id.* at p. 126.

The illicit trade in child pornography is a joint enterprise, albeit a sometimes large and amorphous one. Although the Defendant did not produce Amy's child pornography images, he was part of the "joint enterprise and mutual agency" which received, possessed and distributed her images to ever more willing and eager consumers. It is the scale of this publication of Amy's abuse images and the resulting invasion of her privacy interests which has and will cause the greatest ongoing harm during her lifetime. Each possession and each distribution of each image all combine to what Prosser calls a "single indivisible result:"

> Certain results, by their very nature, are obviously incapable of any logical, reasonable, or practical division. Death is such a result, and so is a broken leg or any single wound, the destruction of a house by fire, or the sinking of a barge. No ingenuity can suggest anything more than a purely arbitrary apportionment of such harm. Where two or more causes combine to produce such a single result, incapable of any logical division, each may be a substantial factor in bringing about the loss, and if so, each must be charged with all of it. . . .

> Such entire liability is imposed both where some of the causes are innocent and where two or more of the causes are culpable. It is imposed where either cause would have been sufficient in itself to bring about a result and also where both were essential to the injury. It is not necessary that the misconduct of two defendants be simultaneous. One defendant may create a situation upon which the other may act later to cause the damage. . . . Liability in such case is not a matter of causation, but of the effect of the intervening agency upon culpability. If a defendant is liable at all, he will be liable for all the damage caused.

Prosser, *Torts* pp. 315-317.

In this case, it is equally impossible to apportion the harm to Amy amongst the numerous past, present and future defendants. This Defendant undeniably contributed to Amy's psychiatric "death by a thousand cuts" when he received and/or distributed and/or possessed her child pornography images with impunity until apprehended by law enforcement. Since pedophiles typically use images as barter for other images, the Defendant also may have profited from Amy's victimization and exploitation.

Congress recognized the difficulty in apportioning harm—so eloquently stated by Prosser—when it adopted 18 U.S.C. 3664 by authorizing joint and several liability for receipt, distribution and possession of child pornography.

### Calculating the Full Amount of Amy's Losses

A criminal restitution order is reviewed for abuse of discretion and will not be overturned provided that it is within the bounds of the statutory framework. *United*

*States v. Johnson*, 132 F.3d 1279, 1286 (9th Cir. 1997). The trial court need only determine the amount of loss by a preponderance of the evidence. *United States v. Menza*, 137 F.3d 533, 537 (7th Cir. 1998). Hearsay testimony may be introduced at sentencing hearings to support a claim for restitution so long as the testimony has "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. 6A1.3(a).

The Mandatory Restitution for Sex Crimes section of the Violence Against Women's Act of 1994 [18 U.S.C. 2259] requires the Defendant to pay Amy the "full amount" of her losses including any costs incurred for:

(A)    medical services relating to physical, psychiatric, or psychological care;
(B)    physical and occupational therapy or rehabilitation;
(C)    necessary transportation, temporary housing, and child care expenses;
(D)    lost income;
(E)    attorneys' fees, as well as other costs incurred; and
(F)    any other losses suffered by the victim as a proximate result of the offense.

Two unrebutted experts calculated the "full amount" of Amy's losses at $3,367,854.[5] A University of Chicago educated Doctor of Economics, Stan V. Smith, in consultation with Amy's distinguished forensic psychologist, Dr. Joyanna Silberg, calculated Amy's cost of future treatment and counseling at $512,681. Amy's lost and reduced income as a result of her abuse and exploitation was actuarially calculated by Dr. Smith, after consulting Dr. Silberg, at $2,855,173.

In addition, Amy's expert witness fees are $17,063.[6] Amy's attorney's fees as well as other costs incurred in this case are not yet finalized but are estimated to be approximately $3000.

In determining the minimum amount of Amy's loss, the Court can consider Congress' presumption in Masha's Law [18 U.S.C. 2255] that victims of child pornography "shall be deemed to have sustained damages of no less than $150,000 in value."[7] See *United States v. Estep*, 378 F.Supp.2d 763 n. 4 (E.D.Ky. 2005).

---

[5]  See *Summary of Losses*, Smith Economics Group, Ltd. report, p. 11.
[6]  The expert fees are broken down as follows:

Dr. Joyanna Silberg / Childhood Recovery Resources ............................................................$7200
Dr. Stan V. Smith / Smith Economics Group, Ltd. ..................................................................$6105
Dr. Sharon W. Cooper / Developmental and Forensic Pediatrics, PA ............................$3500
Miscellaneous Expenses, Copying, Records .............................................................................. $258

[7]  Masha's Law is a civil remedy separate and apart from criminal restitution. The relationship between criminal restitution and civil tort actions was discussed by the Seventh Circuit in *U.S. v. Bach*, 172 F.3d 520 (7th Cir. 1999): "The [MVRA] requires the court to identify the defendant's victims and to order restitution to them in the amount of their loss. In other words, definite persons are to be compensated for definite losses just as if the persons were successful tort plaintiffs. Crimes and torts frequently overlap. In

In *In re Hawaiian Airlines, Inc.*, 355 B.R. 225 (D.Ha 2006), a federal district court ruled that a victim may obtain statutory damages on a per-violation basis, resulting in an award of statutory damages for each violation of the law. The statutory damages set forth in Masha's Law may therefore be multiplied by the number of images downloaded by the Defendant, or for each violation of each provision of the law, or both.

For example, a defendant who pleads guilty to two distinct violations of the federal child pornography laws, such as receipt and distribution of Amy's child pornography images in violation of 18 U.S.C. 2252A(a)(2), will be minimally liable for $300,000 in damages using a "per violation" statutory damages theory ($150,000 for receipt plus $150,000 for distribution).[8]

Using a "per image" statutory damages theory, a defendant who receives four of Amy's child pornography images in violation of 18 U.S.C. 2252A(a)(2) will be minimally liable for $600,000 in damages ($150,000 for each image).

Both of these theories can also be combined. A defendant who both receives and distributes four of Amy's child pornography images commits eight violations of the law and is therefore minimally liable for $1,200,000 in damages ($150,000 multiplied by eight).

### The Attorney General Guidelines

Congress has repeatedly stressed the importance of mandatory restitution:

The committee believes that restitution must be considered a part of the criminal sentence, and that justice cannot be considered served until full restitution is made. . . . The committee also intends that the defendant's affidavit

particular, most crimes that cause definite losses to ascertainable victims are also torts . . . Functionally, the Mandatory Victims Restitution Act is a tort statute, though one that casts back to a much earlier era of Anglo-American law, when criminal and tort proceedings were not clearly distinguished. The Act enables the tort victim to recover his damages in a summary proceeding ancillary to a criminal prosecution. . . . It is a detail from a defrauder's standpoint whether he is ordered to make good his victims' losses in a tort suit or in the sentencing phase of a criminal prosecution." *Id.* at 523.

See also *U.S. v. Duncan*, 870 F.2d 1532 (10th Cir. 1989) (where a civil suit covered the same alleged acts of wrongdoing as the restitution order, and the amount of compensatory damages sought in the civil suit was no greater than the amount alleged by the Government in connection with the criminal offense, there was no abuse of discretion in the district court's deferral to judgment in the civil suit in determining the proper amount of restitution); *U.S. v. Rhodes*, 201 F.Supp.2d 906 (C.D.Ill. 2002) (restitution was not limited to a mail fraud defendant's personal gain; rather, it tracked recovery to which victim would have been entitled in civil suit against the defendant).

[8]  In a recent civil case, *Tilton v. Deslin Hotels, Inc.*, Case No. 8:05-CV-692-T-30TGW (M.D. Fla. Sept. 6, 2007), a federal district court awarded a default judgment of $100,000 under the old version of Masha's Law (in which the statutory damages were $50,000 per violation) based on one violation of 18 U.S.C. 2252A(a) and one violation of 18 U.S.C. 2251(a).

stating the defendant's assets and ability to pay be subject to strict review by the court. In particular, the committee is concerned that defendants not be able to fraudulently transfer assets that might be available for restitution.

Senate Report 104-179, p. 20.

In furtherance of this mandate, we encourage the Government to follow the *Attorney General Guidelines for Victim and Witness Assistance* (May 2005) and seek a prejudgment restraint of the defendant's assets through an injunction prior to sentencing—either voluntary or pursuant to a properly supported motion—to prevent the dissipation or transfer of assets for the benefit of crime victims such as Amy. (See 18 U.S.C. 1345) *Attorney General Guidelines*, p. 39.

Since any criminal monetary penalties must be paid immediately and may be enforced immediately, the Government should encourage the defendant to make payment toward his restitution obligation before the imposition of sentence as directed in U.S.S.G. 3E1.1, cmt. n.1(c) and the *Attorney General Guidelines*, p. 40.

Once restitution is ordered, a lien in favor of the United States should be filed on the defendant's property and rights to property as if it were liability for unpaid taxes. 18 U.S.C. 3613(c). According to the *Attorney General Guidelines*, this lien should be filed by the Financial Litigation Unit in all cases in which restitution is ordered in an amount greater than $500 and not immediately paid. *Attorney General Guidelines*, p. 45.

If the defendant does not have sufficient assets to pay the restitution order immediately without using forfeitable property, the Government is encouraged to use the procedural provisions of the forfeiture statutes to preserve and recover forfeitable property and to apply such property toward satisfaction of the restitution order. *Attorney General Guidelines*, p. 46.

Finally, even though Amy has reached legal adulthood, we ask that the Government continue to recognize her as a child sex crime victim and scrupulously protect her privacy in accordance with 18 U.S.C. 3509(d) and the *Attorney General Guidelines*. Any documents that disclose her name or any other information concerning her should be held in a secure place and disclosed only to persons who by reason of their participation in the proceeding have reason to know the information.

Please notify me immediately if you plan on filing papers that disclose Amy's real name or if you must, for any reason, disclose her identity to the defendant or his attorney. In either situation, the Government should move for an order that Amy's name, address, social security number, and other nonphysical identifying information (other than her age or approximate age) shall not be admissible and may be redacted from otherwise admissible evidence pursuant to 18 U.S.C. 2252A(e).

## Conclusion

Federal law is clear concerning criminal restitution for victims of child pornography: the Defendant must pay Amy the "full amount" of her losses regardless of how many other people are complicit in the crimes against her. The act of one is the act of all and liability for all that is done must be visited upon each defendant.

In calculating the full amount of Amy's losses under 18 U.S.C. 2259, the Court must include a variety of damages including psychological care, lost income and attorney's fees which in Amy's case amounts to at least $3,367,854. There is nothing in the statute that provides for a proportionality analysis.

Since there is no rational basis upon which to apportion damages, Congress provided clear guidance in 18 U.S.C. 2255 that at absolute minimum, victims of child pornography have sustained damages of no less than $150,000 in value.

As Amy told Dr. Silberg, "[e]veryday I have to live in fear of these pictures being seen." According to Dr. Silberg:

> [Amy] states when she is at a friend's house, she is afraid that someone might use Google and that when they Google her name, pictures of her might "pop up" and she would be humiliated. She feels that her privacy has been invaded on a fundamental level as these pictured acts in which she was an unwilling participant are there for other people to find against her will. She fears the discovery of the pictures by her friends, but she also fears the unknown and unnamed people who continue to be looking at these pictures of her for their own perverse interests or to "groom" other children into these acts. She feels continually violated when she contemplates these possibilities. As Amy stated, "*I don't want to be there, but I have to be there and it's never going away, and that's a scary thought.*"

As the criminal justice system carefully considers restitution, it should remember the fear, isolation and personal violation Amy feels every day of her life. The Defendant reaped pleasure from this fear and violation and could have refused to profit from Amy's child pornography images but did not. As Congress said, "restitution must be considered a part of the criminal sentence . . . justice cannot be considered served until full restitution is made." Thank you for your careful attention to this matter.

Sincerely,

James R. Marsh
Victim's 18 U.S.C. 3771 Representative

# THE MARSH LAW FIRM PLLC

PO Box 4668 #65135

New York, New York 10163-4668

Phone (212) 372-3030 / Fax (914) 206-3998 / VNS@MarshLaw.net

## INDIVIDUAL VICTIMS LIKE AMY ARE HARMED BY RECEIPT, DISTRIBUTION OR POSSESSION OF THEIR CHILD PORNOGRAPHY IMAGES

### Introduction

When she was 8 and 9 years old, the victim in the Misty series of child pornography, Amy, was raped and sexually exploited in order to produce child sex abuse images "on demand" for a pedophile in Seattle. The primary reason Amy was raped and forced to endure cunnilingus, fellatio and digital penetration was to provide child pornography for an end user/possessor whose demand for child sex abuse images directly led to her physical and psychological abuse and exploitation. The worldwide distribution of Amy's images have continued in an unbroken chain to this day.

During the production of her child pornography, Amy was forced to hold up written signs and engage in verbal and visual online communication with the Seattle pedophile and other unknown consumers. The child pornography producer even took Amy into the woods near her home to meet pedophiles and child pornography collectors. At the time, Amy did not know these stranger's identities, but they knew her. She still does not know, nor can she ever know, the countless pedophiles who actively seek, receive, distribute and possess her child sex abuse images, secretly trading them in a nefarious underground world of fellow "hobbyists." These degenerates might be living across the street or a thousand miles away. They could be Amy's pastor, her auto mechanic, the local sheriff or the boy next door. Due to the anonymity of the Internet, tens of thousands of pedophiles intimately know Amy, but she does not and cannot know their hidden identities unless or until they are apprehended by law enforcement.

It is the anonymous, furtive nature of the crimes of receipt, distribution and possession of child pornography, along with the fundamental invasion of her privacy and personal dignity, which has caused Amy the greatest harm.

### Restitution is Mandatory

The plain language of 18 U.S.C. 2259(a) states that "in addition to any other civil or criminal penalty authorized by law, **the court shall order restitution for any offense under this chapter**." Restitution is mandatory for violations of any or all of the crimes in Chapter 110 which outlaws production of child pornography, receipt and distribution of child pornography, and conspiracy or attempt to produce, receive or distribute child pornography. 18 U.S.C. 2255 and 18 U.S.C. 2255A. Chapter 110 also

prohibits possession of child pornography and conspiracy or attempt to possess child pornography. 18 U.SC. 2255 and 18 U.S.C. 2255A.

Once a defendant is found guilty or pleads guilty to violating any offense under Chapter 110, the court must order restitution. The plain language of 18 U.S.C. 2259(a) requires the court to order restitution regardless of any other civil or criminal penalties which are possible or imposed.

Congress repeats this mandate again in Section 2259 where it unequivocally states: "Order mandatory. The issuance of a restitution order under this section is mandatory." 18 U.S.C. 2259(b)(4)(a).

An individual is entitled to receive mandatory restitution if they are a "victim." According to 18 U.S.C. 2259, "the term 'victim' means the individual harmed as a result of a commission of a crime under this chapter." In other words, the court must award Amy restitution if she was "harmed" in any way by the defendant's commission or attempted commission of the crime of receipt, distribution or possession of her child pornography images.

The evidence is overwhelming that Amy was, is and will continue to suffer harm as a result of the receipt, distribution or possession of her child sex abuse images. According to Black's Law Dictionary (8th ed. 2004), the term "harm" encompasses "injury, loss, damage" as well as "material or tangible detriment."

## Legislative Intent Concerning Harm

Congress has repeatedly and unequivocally declared that individual child victims are harmed by the receipt, distribution or possession of child pornography. Child pornography is an "affront to the dignity and privacy of the child and the invasion of the child's vulnerability." Hon. Christopher H. Smith, *Congressional Record*, Extension of Remarks, p. E2494 (10-20-1992).

In the Child Pornography Prevention Act of 1996, Congress specifically found that:

(1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years;

. . . .

(7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come;

. . . .

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children;

Public Law 104–208, Section 121, Subsection 1.

The Senate report accompanying the Child Pornography Prevention Act of 1996 outlines the numerous harms vested on child pornography victims. The report begins by declaring that "[c]hild pornography, both photographic and computer-generated depictions of minors engaging in sexually explicit conduct, poses a serious threat to the physical and mental health, safety and well-being of our children." S. Rep. 104-358, p. 7. The Senate Judiciary Committee, which wrote the report, emphasized that "[c]hild pornography is a form of sexual abuse and exploitation which can result in physical or psychological harm, or both, to children. Child pornography permanently records the victim's abuse [and] can cause continuing harm to the depicted individual for years to come." _Id._, p. 8.

In a section entitled: "Child Pornography Threatens the Physical and Mental Health and the Well-Being of Children" the Committee explained that:

"The use of children as subjects of pornographic materials is harmful to the physiological, emotional and mental health of the child." _New York_ v. _Ferber, supra_ at 758. "It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. * * * Sexually exploited children (are) predisposed to self-destructive behavior such as drug and alcohol abuse or prostitution." _New York_ v. _Ferber, supra_ n. 9.

"Children used in pornography are desensitized and conditioned to respond as sexual objects. * * * They must deal with the permanency, longevity, and circulation of such record of their sexual abuse." "Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because

the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. * * * It is the fear of exposure and the tension of keeping the act secret that seems to have the most profound emotional repercussions." *New York* v. *Ferber, supra* at 760, n. 10.

*Id.*, p. 14.

The Committee recognized that child pornography is "a permanent record of the children's participation [in sexual activity] and the harm to the child is exacerbated by their circulation." *Id.*, p.18

In the Additional Views section of the Report, Senator Joseph Biden wrote that:

[c]hild pornography is a heinous crime that preys on the most vulnerable and innocent in our society. It is a devastating act, damaging a child's trust in others and their own sense of self-respect and self-esteem. Moreover, the harmful repercussions to child participants lasts long after the pornography is made, because the pornographic material provides a permanent record of the act, prolonging the victimization as long as the material exists. Child pornography has no redeeming value, and, because of the harm it causes to the minors depicted, it deserves no First Amendment protection.

*Id.*, p. 28.

## Judicial Findings Concerning Harm

In the landmark case of *New York v. Ferber*, 458 U.S. 747 (1982), the Supreme Court found that:

[t]he use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole. It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. . . .

Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child

pornography. . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions.

_Id._ at pp. 758-760 nn. 9, 10.

In _Ashcroft v. Free Speech Coalition_, 535 U.S. 234, 249 (2002), the Supreme Court noted that "as a permanent record of a child's abuse, the continued circulation [of child pornography] itself would harm the child who had participated. Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being." This rationale—that the very existence of child pornography continuously harms a victim—supports the conclusion that the end user/consumer of her child sex abuse images harms Amy, even if the "mere possessor" did not commit the physical act depicted in the images.

In sentencing defendants, lower courts have affirmed the existence of the harm caused by end users/possessors. In _U.S. v. Sherman_, 268 F.3d 539, 547 (7th Cir. 2001), the Seventh Circuit held that the children depicted in child pornography suffer a direct and primary emotional harm when another person possesses, receives or distributes the material. The court reasoned that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters." In _U.S. v. Knox_, 32 F.3d 733, 750 (3rd Cir. 1994), the Third Circuit declared that child pornography is an "affront to the dignity and privacy of the child and an exploitation of the child's vulnerability."

In _U.S. v. Norris_, 159 F.3d 926, 930 (5th Cir. 1998), the Fifth Circuit recognized that:

[t]he consumer who "merely" or "passively" receives or possesses child pornography directly contributes to this continuing victimization . . . [T]he mere existence of child pornography represents an invasion of the privacy of the child depicted. Both the Supreme Court and Congress have explicitly acknowledged that the child victims of child pornography are directly harmed by this despicable intrusion on the lives of the young and the innocent. . . . The recipient of child pornography obviously perpetuates the existence of the images received, and therefore the recipient may be considered to be invading the privacy of the children depicted, directly victimizing these children.

### Amy Was, Is and Will Continue to be Harmed by the Receipt, Distribution or Possession of her Child Sex Abuse Images

According to Amy's forensic psychologist, Dr. Joyanna Silberg, Amy faces a long and difficult course of treatment for post traumatic stress disorder caused by the receipt, distribution or possession of her child pornography images:

> These post traumatic symptoms and effects of sexual abuse are more resistant to treatment than those that would normally follow a time limited trauma, as her awareness of the continued existence of the pictures and their criminal use in a widespread way leads to an activation in these symptoms. . . .

> . . . As noted by Klain, Davies and Hicks (2001) "Child victims of pornography face a lifetime of victimization because the pornography can be distributed indefinitely." . . .

> Feelings of shame and humiliation are some of the worst affective reactions to treat in victims of sexual abuse. These feelings of shame and humiliation are multiplied exponentially for victims of Internet child pornography. Anonymity is something we offer victims of sexual crimes with acknowledgment that they deserve this protection of privacy. Yet, knowing one's image is out there at all times is an invasion of privacy of the highest degree which makes the victim feel known, revealed and publicly shamed, rather than anonymous. . . .

> The ongoing awareness that the pictures are out there interferes significantly with the therapeutic resolution of these problems, as she lives in an enduring state of feeling that she can never really escape or get away from abuse.

> For these reasons, the re-victimization of Amy through the trading of her images on the Internet is the source of enduring trauma that will have lasting effects on her and the symptoms she displays are particularly resistant to standard treatment for post-traumatic stress and the effects of sexual abuse.

> . . . It is expected that she will continue to struggle with the enduring effects of these traumatic experiences as described above over her lifetime. She will require weekly therapy, and it is likely there will be periods where more intensive inpatient treatment or rehabilitation services will be required over the course of her lifetime.

Silberg, *Psychological Consultation* pp. 8-10.

## **Proximate Cause is not a Factor**

The VAWA provisions are broader than any definition of victim in any other federal restitution statute, requiring neither "proximate harm" nor "direct harm" but instead a more generalized "harm."[9] There is absolutely no basis for requiring a causal connection between the victim's losses and the defendant's criminal conduct.

By omitting the term "directly and proximately harmed," Congress has explicitly recognized the causal link between the criminal conduct in Chapter 110 and the harm experienced by victims. While both the Victim and Witness Protection Act [VWPA] and the Mandatory Victim Protection Act [MVRA] define a "victim" as a person "directly and proximately harmed as a result of the commission of an offense," the VAWA provisions only require a victim to be "harmed as a result of a commission of a crime."[10] Compare 18 U.S.C. 3663(a)(2) and 18 U.S.C. 3663A(a)(2) with 18 U.S.C. 2259(c). Proximate cause is simply not a factor and cannot be read into the statue.[11]

---

[9] Several circuit court cases have interpreted the MVRA and VWPA's use of the phrase "directly harmed." For example, it was held that where an indictment charges a scheme, restitution may be awarded to victims of offenses that were part of the same scheme even if those offenses were not specifically listed in the indictment or proved by the government at trial. *See United States v. Henoud,* 81 F.3d 484, 489 (4th Cir.1996).

A defendant is also responsible for restitution for losses caused during any act in furtherance of a conspiracy. *United States v. Obasohan,* 73 F.3d 309, 311 (11th Cir. 1996) (citing *United States v. Plumley,* 993 F.2d 1140, 1142 (4th Cir.1993)); *Gutierrez-Avascal,* 542 F.3d 495, 498 (5th Cir. 2008); *United States v. Davis,* 117 F.3d 459, 463 (11th Cir.1997). The most notable case supporting this point is *Gutierrez-Avascal,* where the Fifth Circuit held that the district court had authority under the MVRA to award restitution to the victim of a car accident that occurred while the defendant was fleeing the police in his automobile in furtherance of a drug conspiracy offense.

In *Plumley,* the Fourth Circuit indicated its willingness to hold a defendant liable in restitution for a co-conspirator's acts in furtherance of the conspiracy. In that case, the defendant conspired to rob a bank. She did not actually rob the bank, but she drove her co-conspirator to a store to buy items for the robbery, provided her co-conspirator with loaded weapons, and drove the getaway car. The Fourth Circuit concluded that "the district court had the statutory authority to order restitution in this case because as a member of the conspiracy, Plumley was liable for all of the actions of her co-conspirators in furtherance of the conspiracy. . . . Stated differently, Plumley's conduct during the course of the conspiracy unquestionably caused *direct harm* to [the bank]." 993 F.2d at 1142. *See U.S. v. Cocilova*, 594 F.Supp.2d 683 (W.D.Va. 2009).

[10] The VAWA provisions were passed in 1994, four years after the Supreme Court's decision in *Hughey v. U.S.,* 495 U.S. 411 (1990). Unlike the law in question in *Hughey,* 18 U.S.C. 2259 does not use the phrase "victim as a result of the offense." Instead it requires the court to award restitution when a defendant commits "any offense under this chapter" to an individual who suffers "harm as a result of a commission of a crime." There is simply no requirement that a victim suffer a "loss sustained as a result of the offense" like there was in *Hughey.*

[11] In *U.S. v. Chalupnik,* 514 F.3d 748 (8th Cir. 2008), the Eighth Circuit found that the MVRA defines a victim as a person "proximately harmed as a result of the *commission* of" the offense. 18 U.S.C. 3663A(a)(2). The court held that the word "commission" reflects an intent to include the defendant's total

The Supreme Court has consistently emphasized the importance of meaningful variation among similar statutes. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) (giving weight to different phrases used by Congress). The presumption is "that the legislature says in a statute what it means and means in a statute what it says . . . ." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 184 (2004). By defining a victim in 18 U.S.C. 2259 as an individual "harmed as a result of a commission of a crime under this chapter," Congress has concluded that a victim of child pornography is *per se* harmed by the defendant's tortious criminal conduct.

Similarly, the inclusion of "proximate cause" in the last of the enumerated types of losses in 18 U.S.C. 2259(b)(3)(F) suggests that such a requirement should not be read into all other types of loss and that such a requirement does not qualify or limit all the other types of losses.

Finally, the argument that 18 U.S.C. 2259 incorporates a proximate cause standard is inconsistent with the Supreme Court's fundamental rationale for upholding such regulation of speech despite First Amendment challenges. The Supreme Court has repeatedly and consistently upheld laws prohibiting the receipt, distribution or possession of child pornography because they prevent harm to the individuals depicted in the images. *Ferber*, 458 U.S. at 760.

If a court finds that possession of child pornography does not harm a victim from a legal causation standpoint, then it is unclear how the same court can uphold a First Amendment challenge to the same law. If possession of child pornography does not harm a victim for restitution purposes, it is not clear how it harms a victim for First Amendment purposes. To remain Constitutional, the absolute ban on child pornography requires defendants convicted of possession to have harmed victims like Amy. Any other conclusion not only runs afoul of the Constitution and almost three decades of legal precedent, but effectively makes the receipt, distribution or possession of child pornography a victimless crime.

---

conduct in committing the offense. Similarly, the VAWA provisions, like the MVRA, refer to a victim as an individual who suffers "harm as a result of a *commission* of a crime under this chapter." Unlike the MVRA, however, "proximate harm" is not required. Instead a more generalized "harm" to the victim is all that must be established in evaluating the defendant's total conduct in committing the crime.