# EXHIBIT 6

  

# Child-Pornography Possessors Arrested in Internet-Related Crimes:

**Findings From the *National Juvenile Online Victimization Study***

# Child-Pornography Possessors Arrested in Internet-Related Crimes:

## Findings From the *National Juvenile Online Victimization Study*

**2005**

**Janis Wolak, David Finkelhor, and Kimberly J. Mitchell**

**Funded by the U.S. Congress Through a Grant to the National Center for Missing & Exploited Children®**

**Copyright © 2005 National Center for Missing & Exploited Children.
All rights reserved.**

This project was supported by Grant No. 2005-MC-CX-K024 awarded by the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice. Points of view or opinions in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice. National Center for Missing & Exploited Children®, 1-800-THE-LOST®, and CyberTipline® are registered service marks of the National Center for Missing & Exploited Children.

# Contents

**Acknowledgments...v**

**Executive Summary...vii**

**Introduction...ix**
    Child-Pornography Laws Vary…ix
    What Motivates CP Possessors?…x

**How Was the *N-JOV Study* Conducted?...xi**

**Key Questions...1**
    How Many People Were Arrested for CP Possession?…1
    Who Were the Arrested CP Possessors?…1
    What Kinds of Child-Pornography Pictures Did Arrested Offenders Have?…4
        How Old Were the Children in the Pictures?…4
        Were the Children in the Pictures Girls or Boys?…5
        How Graphic Were the Pictures?…5
        Did CP Possessors Have "Morphed" Pictures?…7
        How Many CP Possessors Had CP Videos?…7
    How Many Pictures Did CP Possessors Have?…7
    Where and How Did CP Possessors Use Computers to View and Acquire Pictures?…7
    Were CP Possessors Using Sophisticated Technology to Hide Their Images?…9
    How Many CP Possessors Had Organized Child-Pornography Collections?…10
    How Many Arrested CP Possessors Distributed Child Pornography?…12
    How Did Cases Involving CP Possession Arise in the Criminal-Justice System?…12
        How Often Did Cases Start With Reports From the Public, and How Often Did They Start With Investigations by Law Enforcement?…13
            Cases Starting With Reports by Individuals...15
            Cases Starting With Law-Enforcement Investigations...15
        Where in the Criminal-Justice System Did CP Possession Cases Arise?…15
    Dual Offenders: How Often Did Offenders Both Sexually Victimize Children and Possess Child Pornography?…16
        How Many Dual Offenders Were Found in Investigations Beginning as Allegations or Investigations of Child Pornography?…16
        How Many Dual Offenders Used Child Pornography to Seduce or Groom Minors?…18
        How Many Dual Offenders Were Found in Other Types of Internet-Related Sex Crimes Committed Against Minors?…19
    How Did CP Possession Cases Fare at Prosecution?…19

What Impact Has the *Ashcroft vs. Free Speech Coalition* Decision Had on
State and Local Prosecutions for Possession of Child Pornography?…21
  Prosecutor Interviews…22
  Prosecution Tactics…24
  Protocols for CP Possession Cases…24
  Early Conclusions About the Impact of the Ruling in State
  and Local Courts…25

**Major Findings and Conclusions…27**

**Limitations…31**

**Recommendations…33**

**Resources for Law-Enforcement Investigators and Prosecutors…39**

**Appendix: More About the Methodology of the *N-JOV Study*…41**

**References…45**

# Acknowledgments

We are grateful for the talents and perseverance of research assistants

Elisabeth Cloyd
Raegh Greenleaf
Roberta Gross
Dianne Ramey
Chip Smith
Melissa Wells

And we especially thank the hundreds of dedicated law-enforcement agents and investigators who helped us develop this study; filled out our mail survey; searched records to track down cases; and answered our many interview questions with interest, patience, and good humor.

Thanks also go to several National Center for Missing & Exploited Children (NCMEC) report reviewers including Ernest E. Allen, President and Chief Executive Officer; John B. Rabun, Jr., Vice President and Chief Operating Officer; Supervisory Special Agent Eileen Jacob, Former Federal Bureau of Investigation (FBI) Liaison to NCMEC; Daniel Armagh, Former Director of Legal Education; Michelle Collins, Director of the Exploited Child Unit; Robert Hoever, Deputy Director of Special Operations; Jessica Derder, Former Staff Attorney; Marsha Gilmer-Tullis, Director of the Family Advocacy Division; Tina Schwartz, Director of Communications; Geraldine Kochan, Research Analyst; Terri Delaney, Director of Publications; and Christina Miles, Publications Assistant.

Special thanks also go to Ronald C. Laney, Associate Administrator, Child Protection Division, Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice; and Bradley Russ, former Police Chief of the Portsmouth (New Hampshire) Police Department and Director, Internet Crimes Against Children Training & Technical Assistance Program for their review of this report.

# Executive Summary

The goals of the *National Juvenile Online Victimization (N-JOV) Study* were to survey law-enforcement agencies within the United States (U.S.) to count arrests for Internet-related sex crimes committed against minors and describe the characteristics of the offenders, the crimes they committed, and their victims. This report focuses on a representative national sample of arrested offenders who possessed child pornography.[1] Key findings about the possession of child pornography (CP) include

- Law-enforcement agencies nationally made an estimated 1,713 arrests for Internet-related crimes involving the possession of child pornography during the 12 months beginning July 1, 2000.
- Almost all arrested CP possessors were male, 91% were white, and 86% were older than 25. Only 3% were younger than 18.
- Most had images of prepubescent children (83%) and images graphically depicting sexual penetration (80%).
- Approximately 1 in 5 arrested CP possessors (21%) had images depicting sexual violence to children such as bondage, rape, and torture.
- 39% had at least 1 video with moving images of child pornography.
- 53% of the cases involving child pornography arose in the criminal-justice system as CP possession or distribution cases, 31% arose as cases of child sexual victimization,[2] and 16% arose as Internet solicitations to undercover investigators (attempted child sexual victimization).
- Most arrested CP possessors (57%) came to the attention of law enforcement via complaints from individuals outside of law enforcement.
- CP possession cases originated at all levels of law enforcement, with 25% beginning in federal agencies; 11% in Internet Crimes Against Children (ICAC) Task Forces (which were not yet fully operational during the time frame of this study); 60% in other state and local agencies; and 3% in other agencies like international law enforcement.

---

[1] The term "child pornography," because it implies simply conventional pornography with child subjects, is an inappropriate term to describe the true nature and extent of sexually exploitive images of child victims. Use of this term should not be taken to imply that children "consented" to the sexual acts depicted in these photographs. We have, however, retained the term because there is a history in the United States of court decisions and statutes that have used and developed the term, and it is the term most readily recognized by the public, at this point in time, to describe this form of child sexual exploitation. "Child pornography" is used in this report to refer to visual depictions of the sexual exploitation of a child under the standards developed by statute, case law, and law-enforcement-agency protocols. It is hoped that a more accurate term will be recognized, understood, and accepted for use in the near future.

[2] We use the term "child sexual victimization" broadly to mean the full range of sex crimes committed against minors that involve direct interaction with child victims. These include contact crimes such as child sexual abuse and molestation and noncontact crimes such as online sexual solicitation.

- 40% of arrested CP possessors were "dual offenders," who sexually victimized children and possessed child pornography, with both crimes discovered in the same investigation. An additional 15% were dual offenders who **attempted** to sexually victimize children by soliciting undercover investigators who posed online as minors.
- One in six investigations beginning with allegations or investigations of CP possession discovered dual offenders.
- In the overall *N-JOV Study*, 39% of arrested offenders who met victims online and 43% of offenders who solicited undercover investigators were dual offenders.
- Almost all arrested CP possessors (96%) were convicted or plead guilty, and 59% were incarcerated.

# Introduction

The possession or distribution of child pornography is illegal under federal laws and laws in all 50 states; however, researchers and law-enforcement officials believe this crime is increasing and the increase is related to growing Internet use. The U.S. Department of Justice has responded to this problem in several ways. It has funded the CyberTipline®, at www.cybertipline.com, which is operated by the National Center for Missing & Exploited Children to act as a national clearinghouse for reports of Internet-related child pornography and other Internet-related sex crimes committed against children. It has created regional Internet Crimes Against Children Task Forces to assist state and local law enforcement in handling these crimes and funded specialized Internet child exploitation units in federal law-enforcement agencies. Investigators in these specialized agencies and units monitor the Internet for child pornography; conduct undercover, proactive investigations to identify persons who seek to victimize children they encounter over the Internet; train other law-enforcement agencies to handle cases of child pornography; and conduct forensic examinations of computers to search for child pornography and preserve it as evidence when it is found.

While law enforcement has mobilized against CP possession, there has been little scientific data to track the extent of CP possession cases in the criminal-justice system and describe their characteristics. This report, on the findings of the *N-JOV Study*, addresses that need by estimating the number of arrests for CP possession and describing the characteristics of CP possessors, the nature of the images they possessed, and how and in what types of agencies their cases came to the attention of law enforcement. It also discusses how many arrested offenders who had child pornography distributed it and how many committed other types of sex crimes against minors.

## Child-Pornography Laws Vary

The federal statute defines "child pornography" as the "visual depiction…of sexually explicit conduct" involving a "minor."[3] The federal statute also specifies sexually explicit conduct includes certain sexual acts such as intercourse, bestiality, and masturbation, as well as "lascivious exhibition of the genitals or pubic area"[4]; however, state statutes defining child pornography differ among jurisdictions. Definitions of child pornography vary from state to state, and state legislation may not mirror the language of the federal statute. Further disparity exists in the definition of "minor" or "child." The federal statute defines "minor" as "any person under the age of [18] years."[5] While a majority of states follow

---

[3] 18 U.S.C. § 2256(8).
[4] *Id.* at § 2256(2).
[5] *Id.* at § 2256(1).

the federal statute, some state laws define "minor" or "child" as a youth younger than 14, 16, or 17.[6] Delaware law includes any person 18 years of age and younger in its definition of "child."[7]

## What Motivates CP Possessors?

There is not much research about the motivations of CP possessors, but what there is suggests CP possessors are a diverse group using child pornography for a variety of reasons (Klain, Davies, & Hicks, 2001; Taylor & Quayle, 2003). CP possessors include people who are

- Sexually interested in prepubescent children (pedophiles) or young adolescents (hebephiles), who use child-pornography images for sexual fantasy and gratification
- Sexually "indiscriminant," meaning they are constantly looking for new and different sexual stimuli
- Sexually curious, downloading a few images to satisfy that curiosity
- Interested in profiting financially by selling images or setting up web sites requiring payment for access

---

[6] According to research conducted by the National Center for Missing & Exploited Children in December 2004 on state statutes criminalizing **possession** of child pornography, 37 states define "minor" or "child" as a youth younger than the age of 18 (Alaska, ALASKA STAT. § 11.61.127(a); Arizona, ARIZ. REV. STAT. § 13-3551(5); California, CAL. PENAL CODE § 311.11(a); Colorado, COLO. REV. STAT. § 18-6-403(2)(a); Connecticut, CONN. GEN. STAT. § 1-1d; Florida, FLA. STAT. ch. 827.01(2); Georgia, GA. CODE ANN. § 16-12-100(a)(1); Hawaii, HAW. REV. STAT. § 707-752(2); Idaho, IDAHO CODE § 8-1507(2)(b); Illinois, 720 ILL. COMP. STAT. 5/11-20.1(6); Iowa, IOWA CODE § 728.1(4); Kansas, KAN. STAT. ANN. § 21-3516(a)(2); Kentucky, KY. REV. STAT. ANN. §§ 2.015, 500.080(9); Massachusetts, MASS. GEN. LAWS ch. 272, § 29C; Michigan, MICH. COMP. LAWS § 750.145c(b); Minnesota, MINN. STAT. § 617.246(1)(b); Mississippi, MISS. CODE ANN. § 97-5-31(a); Missouri, MO. REV. STAT. § 573.010(2); Montana, MONT. CODE ANN. §§ 45-5-625, 45-8-205; New Mexico, N.M. STAT. ANN. § 30-6A-3(A); North Carolina, N.C. GEN. STAT. § 14-190.13(3); North Dakota, N.D. CENT. CODE § 12.1-27.2-05(1); Ohio, OHIO REV. CODE ANN. § 2907.01(M); Oklahoma, OKLA. STAT. tit. 21, § 1024.1(A); Oregon, OR. REV. STAT. § 163.665(1); Pennsylvania, 18 PA. CONS. STAT. § 6312(d)(1); Rhode Island, R.I. GEN. LAWS § 11-9-1.3(c)(3); South Carolina, S.C. CODE ANN. § 16-15-375(3); South Dakota, S.D. CODIFIED LAWS § 22-22-24.1(3); Tennessee, TENN. CODE ANN. § 39-17-1002(3); Texas, TEX. PENAL CODE ANN. § 43.26(a); Utah, UTAH CODE ANN. § 76-5a-2(5); Virginia, VA. CODE ANN. § 18.2-374.1:1(A); Washington, WASH. REV. CODE § 9.68A.011(4); West Virginia, W. VA. CODE § 61-8C-1(a); Wisconsin, WIS. STAT. § 948.01(1); Wyoming, WYO. STAT. ANN. § 6-4-303(a)(i)); 3 define "minor" or "child" as a youth younger than the age of 17 (Alabama, ALA. CODE § 13A-12-192; Arkansas, ARK. CODE ANN. § 5-27-302(1); and Louisiana, LA. REV. STAT. ANN. § 14:81.1(A)(3)); 7 define "minor" or "child" as a youth younger than the age of 16 (Indiana, IND. CODE § 35-42-4-4(c); Maryland, MD. CODE ANN., Crim. Law § 11-208(a); Nevada, NEV. REV. STAT. 200.730; New Hampshire, N.H. REV. STAT. ANN. § 649-A:2(I); New Jersey, N.J. STAT. ANN. § 2C: 24-4(b)(1); New York, N.Y. PENAL LAW § 263.16; and Vermont, VT. STAT. ANN. tit. 13, § 2821(1)); and 1 defines "minor" or "child" as a youth younger than the age of 14 (Maine, ME. REV. STAT. ANN. tit. 17, § 2924(2-A)).

The age of a "child" in Nebraska depends on whether the child is a participant (younger than 18 years of age) or a portrayed observer (younger than 16 years of age). NEB. REV. STAT. § 28-1463.02(1).

In the District of Columbia, possession of child pornography with the intent to disseminate may be prosecuted under the general obscenity statute; however, mere possession is not mentioned. D.C. CODE ANN. § 22-2201(a)(1)(E). There are two criminal offenses that address "sexual performances using minors": "using a minor in a sexual performance" and "promoting a sexual performance by a minor." D.C. CODE ANN. § 22-3102. For these offenses, "minor" is defined as any person younger than 16 years of age. D.C. CODE ANN. §§ 22-3101(2), 22-3102.

[7] DEL. CODE ANN. tit. 11, § 1103(e).

# How Was the *N-JOV Study* Conducted?

Interviewers conducted detailed, structured interviews with investigators from a national sample of local, county, state, and federal law-enforcement agencies about cases involving Internet-related sex crimes committed against minors including CP possession. To qualify for the study cases had to end in arrests. The study was designed to gain

- An overall picture of arrests for Internet-related sex crimes committed against minors, including CP possession, in the U.S.
- An understanding of how these arrests emerged as cases and were handled in a diverse group of agencies
- Detailed data about the characteristics of the crimes; offenders; and, when possible, victims

We limited the study to cases ending in arrests rather than crime reports or open investigations because cases ending in arrests were more likely to involve actual crimes and have more complete information about the crimes, offenders, and victims. Using crimes ending in arrests also gave a clear standard for counting cases and helped us avoid interviewing multiple agencies about the same case. We interviewed law-enforcement investigators because investigators have been in the forefront of identifying and combating these crimes and were the best sources of accessible, in-depth information about them.

We used a two-phase process to collect data from a national sample of law-enforcement agencies. In Phase 1 we surveyed 2,574 local, county, and state law-enforcement agencies by mail asking if they had made arrests in Internet-related, child-pornography, or sexual-exploitation cases between July 1, 2000, and June 30, 2001. In Phase 2 interviewers conducted detailed telephone interviews with law-enforcement investigators about a sample of the cases reported in the mail surveys. In addition two federal agencies participated in the telephone interviews. The interviewers also asked for and recorded narrative descriptions of each case. The final data set, weighted to account for sampling procedures and other factors, included data from 612 completed interviews, 429 of which involved offenders who possessed child pornography. To be eligible for the study, a case had to

- Be a sex crime
- Have a victim who was younger than 18, including victims pictured in child pornography
- Involve an arrest occurring between July 1, 2000, and June 30, 2001
- Be Internet-related

Cases were Internet-related if

- An offender-victim relationship was initiated online (online-meeting cases)
- An offender used the Internet to communicate with a victim to further a sexual victimization or otherwise exploit the victim
- A case involved an Internet-related undercover investigation
- Child pornography was received or distributed online, or arrangements for receiving or distributing were made online
- Child pornography was found on a computer, on removable media such as floppy disks and compact disks (CD), as computer printouts, or in a digital format

The "Appendix" has more details about the sample and mail and telephone surveys including examples of the questions asked in interviews. An overview of the *N-JOV Study* findings, "Internet Sex Crimes Against Minors: The Response of Law Enforcement" is available online at the web site of the National Center for Missing & Exploited Children at www.missingkids.com or through the web site of the Crimes against Children Research Center at www.unh.edu/ccrc.

# Key Questions

## How Many People Were Arrested for CP Possession?

There were an estimated 1,713 arrests[8] for Internet-related CP possession in the 12 months beginning July 1, 2000. This estimate has a 2.5% margin of error in either direction, which means the true number is between 1,578 and 1,847 arrests.

This estimate of 1,713 Internet-related CP possession cases ending in arrest is by no means a full measure of the number of Internet-related CP possessors or even the number of CP possessors reported to or otherwise known to law enforcement. It is only an estimate of the number of **arrests** for such crimes during the year covered by the *N-JOV Study*. The CyberTipline, operated by the National Center for Missing & Exploited Children to receive reports of child sexual exploitation, received 21,910 reports during the 12-month period covered by the *N-JOV Study* with 19,093 of those reports (87%) being reports of child pornography. Many of these reports were forwarded to the appropriate law-enforcement agency for possible investigation. In addition, when jurisdictional information about the offender is not available, the CyberTipline reports are provided to federal law-enforcement agencies in the United States. Further, it is likely most CP possessors never come to the attention of law enforcement, because the Internet allows them to commit their crimes privately and anonymously (Jenkins, 2001).

At the same time, to give some perspective on this estimate of 1,713 arrests for Internet-related CP possession, we estimate there were approximately 65,000 arrests in 2000 for all types of sexual assaults committed against minors. This is a rough estimate made from the Federal Bureau of Investigation's National Incident-Based Reporting System. Clearly the number of estimated arrests for CP possession is small in comparison; however, all indications are law-enforcement activity and consequently arrests for CP possession are growing as Internet use grows and law-enforcement agencies expand their resources and gain experience in responding to this crime.

## Who Were the Arrested CP Possessors?

Virtually all of the arrested CP possessors were men (Table 1). They were predominantly white (91%) and older than 25 (86%). Only 3% were younger than 18. Most were unmarried at the time of their crime, either because they had never married (41%) or because they were separated, divorced, or widowed (21%). Thirty-eight percent were either married or living with partners.

Many of them had access to minor children. Forty-two percent had adult or minor biological children, and 34% were living with minor children at the time of their crime. Forty-six percent had direct access to minors because they lived with them or had access through a job or organized youth activity.

---

[8] The researchers used a statistical technique called "weighting" to estimate annual numbers of arrests. *See* the "Appendix" for more information about weighting procedures.

As far as investigators knew, few CP possessors had histories of problem or criminal behavior. Few had been diagnosed with mental or sexual disorders (5% and 3%, respectively), and few evidenced deviant sexual behavior not involving minors such as bestiality and sadism (12%). Eighteen percent had known problems with drugs or alcohol. Not many had been violent to any extent known to law enforcement (11%) or had prior arrests for nonsexual offending (22%). Eleven percent had been previously arrested for sex offenses committed against minors.

These statistics apply to the overall group of arrested CP possessors. As individuals they were quite diverse. They ranged in age from 15 to 70. Some were well educated, and some had not finished high school. Some were wealthy. Some were poor. Some were middle class. Some were well known and well thought of in their communities. Some had high-profile jobs. Some seemed isolated and obsessed with the Internet. Some had long criminal histories. They came from cities, suburbs, small towns, and rural areas.

**Table 1. Arrested CP Possessors: Characteristics**
(Weighted n = 1,713; Unweighted n = 429)

| Demographic Characteristics | % Internet-Related CP Possessors |
|---|---|
| Gender | |
| Male | 100% |
| Female | < 1% |
| Race | |
| White | 91% |
| Other | 8% |
| Age | |
| Younger than 18 | 3% |
| 18 to 25 | 11% |
| 26 to 39 | 41% |
| 40 or Older | 45% |
| Marital Status | |
| Single, Never Married | 41% |
| Married or Living with Partner | 38% |
| Separated or Divorced | 20% |
| Widowed | 1% |
| Type of Community | |
| Urban | 22% |
| Suburban/Large Town | 41% |
| Small Town or Rural | 33% |
| Education | |
| Did Not Finish High School | 5% |
| High-School Graduate | 38% |
| Some College Education or Technical Training | 21% |
| College Graduate | 16% |
| Post College Degree | 4% |
| Don't Know | 17% |

| Demographic Characteristics | % Internet-Related CP Possessors |
|---|---|
| Employed Full-Time | |
| Yes | 73% |
| No | 25% |
| Income | |
| Less than $20,000 | 18% |
| $20,000 to $50,000 | 41% |
| More than $50,000 to $80,000 | 17% |
| More than $80,000 | 10% |
| Don't Know | 13% |
| Had Adult or Minor Biological Children | |
| Yes | 42% |
| No | 53% |
| Lived with Minor Child | |
| Yes | 34% |
| No | 65% |
| Had Direct Access to Minors Through Job, Organized Youth Activity, or in Home | |
| Yes | 46% |
| No | 48% |
| Don't Know | 6% |
| Diagnosed Mental Illness | |
| Yes | 5% |
| No | 89% |
| Don't Know | 6% |
| Diagnosed Sexual Disorder | |
| Yes | 3% |
| No | 87% |
| Don't Know | 10% |
| Evidence of Deviant Sexual Behavior Not Involving Minors | |
| Yes | 12% |
| No | 84% |
| Any Known Problems With Drugs or Alcohol | |
| Yes | 18% |
| No | 75% |
| Don't Know | 7% |
| Any Known Incidents of Violence | |
| Yes | 11% |
| No | 85% |
| Any Known Prior Arrest for Nonsexual Offense | |
| Yes | 22% |
| No | 73% |
| Any Known Prior Arrest for Sexual Offense Committed Against a Minor | |
| Yes | 11% |
| No | 87% |

Notes: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001. Some percentages do not add to 100% because of rounding or missing data. Ns and percentages may not be proportionate because results are weighted to reflect selection probabilities and some cases have more influence than others. Missing data are shown when they exceed 5%. Most missing values are because investigators did not have complete information in every case.

To give readers an idea of the array of CP possession cases law-enforcement agencies faced, boxes throughout this report provide brief descriptions of cases that were part of the *N-JOV Study*. These cases arose among the full range of U.S. law-enforcement agencies, from small local agencies seeing such cases for the first time to specialized, experienced agencies with highly trained investigators. The cases also arose in different states and jurisdictions throughout the U.S. By describing court outcomes, the descriptions show the variety of responses by criminal courts to this offense. The case descriptions illustrate there is no stereotypical CP possession case and show the value of law-enforcement training programs and forensic resources for effective responses to the crime of CP possession.

**Box 1: Description of a CP Possessor**

**CP possessors came to the attention of law enforcement in various ways.** A 54-year-old man who was a lawyer met an adult woman, a nurse, online. They agreed to an online sexual role-play, in which she would be a little girl and he would be her grandfather. According to the investigator, at times during their online fantasy, the lawyer would say to the woman, "I need you to be an adult now," and they would step out of the fantasy and discuss other matters. This relationship ended when the lawyer sent the woman child pornography and she reported him to law enforcement. The lawyer had a large number of child-pornography images. He told the investigator he had seen a doctor and been diagnosed as a "sex addict" about nine years before his arrest. After he was arrested he signed himself into a treatment program specializing in pedophilia. He pled guilty to CP possession, was sentenced to five years of probation, and was required to register as a sex offender.

## What Kinds of Child-Pornography Pictures Did Arrested Offenders Have?

Broad definitions of sexually exploitive images of children raise questions about whether individuals are being arrested and labeled as CP possessors for images that do not picture child sexual victimization or which depict older adolescents. For example some controversial legal rulings have defined child pornography to include suggestive images of clothed children.[9] The results of the *N-JOV Study*, however, show the vast majority of arrests involved CP possessors with images of young children and images explicitly showing sexual acts.

### How Old Were the Children in the Pictures?[10]
According to investigators interviewed, most arrested CP possessors had images of children who had not yet reached puberty.
- 83% had images of children between the ages of 6 and 12 (Table 2)
- 39% had images of 3 to 5 year old children
- 19% had images of toddlers or infants younger than 3

---

[9] *See e.g., United States v. Knox*, 32 F.3d 733 (3rd Cir. 1994).
[10] The "Appendix" lists the questions asked about the children pictured in the images and the nature of the images.

Offenders typically had pictures of both prepubescent children and adolescents, but 17% had pictures of children ages 12 and younger exclusively and 8% had pictures of adolescents, ages 13 to 17, exclusively.

## Were the Children in the Pictures Girls or Boys?

More girls than boys were pictured. Sixty-two percent of arrested CP possessors had pictures of mostly girls. Fourteen percent had pictures of mostly boys, and 15% had pictures showing girls and boys in about equal numbers.

## How Graphic Were the Pictures?

Most arrested CP possessors had graphic images explicitly showing sexual acts performed by or on children.

- 92% had images of minors focusing on genitals or showing explicit sexual activity
- 80% had pictures showing the sexual penetration of a child, including oral sex

Most (71%) possessed images showing sexual contact between an adult and a minor, defined as an adult touching the genitals or breasts of a minor or vice-versa.

About one-fifth (21%) had child pornography depicting violence such as bondage, rape, or torture. Most of these involved images of children who were gagged, bound, blindfolded, or otherwise enduring sadistic sex.

Most arrested CP possessors (79%) also had what might be termed "softcore" images of nude or semi-nude minors, but only 1% possessed such images alone. Further some of those with softcore images only also had sexually victimized children. Overall the images the arrested offenders possessed were very graphic.

**Table 2. Arrested CP Possessors: Nature of Child-Pornography Images Possessed**
(Weighted n = 1,713; Unweighted n = 429)

| Characteristics of Child-Pornography Images | % Internet-Related CP Possessors |
|---|---|
| Had CP Images of Children Younger than 3 | |
| Yes | 19% |
| No | 69% |
| Don't Know | 11% |
| Had CP Images of Children 3 to 5 Years Old | |
| Yes | 39% |
| No | 50% |
| Don't Know | 11% |
| Had CP Images of Children 6 to 12 Years Old | |
| Yes | 83% |
| No | 8% |
| Don't Know | 9% |
| Had CP Images of Children 13 to 17 Years Old | |
| Yes | 75% |
| No | 15% |
| Don't Know | 10% |
| Had Images of Children Younger than 13 Exclusively | |
| Yes | 17% |
| No | 75% |
| Don't Know | 9% |

| Characteristics of Child-Pornography Images | % Internet-Related CP Possessors |
|---|---|
| **Had Images of Children 13 to 17 Years Old Exclusively** | |
| Yes | 8% |
| No | 83% |
| Don't Know | 9% |
| **Gender of Children Depicted** | |
| Mostly Girls | 62% |
| Mostly Boys | 14% |
| Both, About Equal Numbers | 15% |
| Don't Know | 9% |
| **Had Images Showing Genitals of or Sexual Activity by Minors (Graphic Images)** | |
| Yes | 92% |
| No | 1% |
| Don't Know | 7% |
| **Had Images Showing the Sexual Penetration of a Minor** | |
| Yes | 80% |
| No | 8% |
| Don't Know | 11% |
| **Had Images Showing Sexual Contact Between Adults and Minors** | |
| Yes | 71% |
| No | 15% |
| Don't Know | 14% |
| **Had Images Showing Sexual Violence Committed Against Minors** | |
| Yes | 21% |
| No | 67% |
| Don't Know | 12% |
| **Had Images Showing Nude or Semi-Nude Minors (Not Graphic)** | |
| Yes | 79% |
| No | 9% |
| Don't Know | 12% |
| **Had No Graphic Images** | |
| Yes | 1% |
| No | 92% |
| Don't Know | 7% |
| **Had "Morphed" Images** | |
| Yes | 3% |
| No | 78% |
| Don't Know | 19% |
| **CP Images were on Hard Drive or Removable Media** | |
| Yes | 96% |
| No | 4% |
| **CP Images were on Videos** | |
| Yes | 39% |
| No | 53% |
| Don't Know | 8% |
| **CP Images were Photographs or in Books, Magazines, or Other** | |
| Yes | 18% |
| No | 76% |
| Don't Know | 6% |
| **Numbers of Graphic Still Images** | |
| None (Videos Only) | 4% |
| 1 to 100 | 37% |
| 101 to 999 | 34% |
| 1,000 or More | 14% |
| Don't Know | 10% |

Notes: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001. Percentages refer to CP possessors, not child-pornography images. Some percentages do not add to 100% because of rounding or missing data. Ns and percentages may not be proportionate because results are weighted to reflect selection probabilities and some cases have more influence than others. Missing data are shown when they exceed 5%. Most missing values are because investigators did not have complete information in every case.

### Did CP Possessors Have "Morphed" Pictures?

Because computer software allows people to modify and even create images – a process called "morphing" – some have been concerned "morphed" pictures will become another source of child pornography. Only 3% of arrested CP possessors in this sample, however, had morphed images, defined as images created using computer graphics. This number may have increased subsequent to the *N-JOV Study* as software for creating these kinds of images has become more widely used.

### How Many CP Possessors Had CP Videos?

Videos are a particularly graphic form of child pornography because they include motion and sound. Thirty-nine percent of arrested CP possessors had moving images in digital or other video formats.

## How Many Pictures Did CP Possessors Have?

Some offenders had truly large numbers of pictures. Of those arrested for CP possession, law enforcement found about half (48%) had more than 100 graphic still images, and 14% had 1,000 or more graphic images. Thirty-seven percent of CP possessors had 100 or fewer graphic still images; however, the numbers of images possessed may be higher than this because investigators did not always do complete inventories since full forensic examinations of computers are time-consuming and expensive.

**Box 2: Description of a CP Possessor**

**The amounts of child pornography possessed ranged from one item to many thousands of images.**
A man in his 50s, who worked as a teacher's aid for disabled students, ordered a child-pornography video from a distribution site operated by undercover investigators. This man lived alone in a mobile-home park where many children lived. He volunteered with organizations that helped disabled children. When law enforcement searched his home and computer for child pornography, they found only the one video he had ordered. The man had numerous teddy bears and children's toys in his home and investigators were concerned he used them to entice children into his home. He had been accused of child molestation a few years previously in another state, but not arrested. He committed suicide soon after his home was searched in the current investigation.

## Where and How Did CP Possessors Use Computers to View and Acquire Pictures?

Almost all of the arrested CP possessors (91%) mainly used home computers to access child pornography (Table 3); however, some (9%) mainly used computers at less private places like at work (7%) or other places (2%) such as libraries,

schools, and rental venues. These CP possessors may not have had computers at home or if they had them, they may have been unable or reluctant to use them for accessing child pornography. Also almost 1 in 5 arrested CP possessors (18%) used computers in more than 1 location to access child pornography, mostly at work as well as home.

Most arrested CP possessors did not have sophisticated equipment. Sixty-five percent had "a basic computer system that would be found in the average home." Another 22% had a powerful system "an average person who was knowledgeable about computers might own." Only 7% were described as having a "very sophisticated system an expert would own."

CP possessors could have basic equipment, but be skilled Internet users who knew how to evade detection by using advanced technologies to hide their identities and pictures. Interviewers asked investigators to assess CP possessors' degree of knowledge about the Internet. Investigators described 10% of arrested CP possessors as being "extremely knowledgeable" about the Internet. Three percent were described as "not at all" knowledgeable, and the rest were described as "somewhat" (40%) or "very" (44%) knowledgeable. These were subjective judgments by the investigators we interviewed, who had different degrees of knowledge about the Internet themselves.

**Table 3. Arrested CP Possessors: Computer Use**
(Weighted n = 1,713; Unweighted n = 429)

| Characteristics of Computer Use | % Internet-Related CP Possessors |
|---|---|
| Location of Computer Primarily Used in Crime | |
| Home | 91% |
| Work | 7% |
| Other Place | 2% |
| Used Computer in More than One Place in Crime | |
| Yes | 18% |
| No | 77% |
| Ever Used Computer at Work in Crime | |
| Yes | 17% |
| No | 79% |
| Type of Computer System Used Most by Offender | |
| Basic Home System | 65% |
| Powerful Home System | 22% |
| Very Sophisticated System an Expert Would Use | 7% |
| Don't Know | 6% |
| Degree of Knowledge About the Internet | |
| Not at All Knowledgeable | 3% |
| Somewhat Knowledgeable | 40% |
| Very Knowledgeable | 44% |
| Extremely Knowledgeable | 10% |
| Used Sophisticated Methods to Hide Images | |
| Yes | 20% |
| No | 62% |
| Don't Know | 18% |

| Characteristics of Computer Use | % Internet-Related CP Possessors |
|---|---|
| Used Password Protection | |
| Yes | 12% |
| No | 71% |
| Don't Know | 16% |
| Used Encryption | |
| Yes | 6% |
| No | 77% |
| Don't Know | 17% |
| Used File Servers | |
| Yes | 4% |
| No | 78% |
| Don't Know | 18% |
| Used Evidence-Eliminator Software | |
| Yes | 3% |
| No | 85% |
| Don't Know | 12% |
| Used Remote Storage | |
| Yes | 2% |
| No | 81% |
| Don't Know | 18% |
| Used Partitioned Hard Drive | |
| Yes | 2% |
| No | 86% |
| Don't Know | 12% |
| Used Anonymous Remailer | |
| Yes | < 1% |
| No | 81% |
| Don't Know | 19% |
| Used Peer-to-Peer Networks | |
| Yes | < 1% |
| No | 83% |
| Don't Know | 17% |
| Used More Than One Sophisticated Method | |
| Yes | 6% |
| No | 76% |
| Don't Know | 18% |

Notes: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001. Some percentages do not add to 100% because of rounding or missing data. Ns and percentages may not be proportionate because results are weighted to reflect selection probabilities and some cases have more influence than others. Missing data are shown when they exceed 5%. Most missing values are because investigators did not have complete information in every case.

## Were CP Possessors Using Sophisticated Technology to Hide Their Images?

Few arrested CP possessors (20%) had used any sort of method to hide the child pornography on their computers. The most popular method to hide images was password protection, used by 12% of CP possessors. A small number of arrested

CP possessors used more sophisticated methods, like encrypted files (6%), file servers (4%), evidence-eliminator software (3%), remote storage (2%), partitioned hard drives (2%), or anonymous remailers (< 1%). Less than 1% used peer-to-peer networks, although peer-to-peer technology was relatively new during the time frame of the *N-JOV Study*, so those numbers may have grown as peer-to-peer networks have become more common.

It appears most arrested CP possessors were not taking advantage of technology they could have used to hinder detection. One possible explanation for this is more technologically sophisticated CP possessors managed to avoid detection. Alternatively the explanation may be most CP possessors want easy access to their images and so are reluctant to use methods like encryption. Others simply may not be interested in or knowledgeable about the technology.

## How Many CP Possessors Had Organized Child-Pornography Collections?

Some researchers have found CP possessors have different degrees of involvement in their child-pornography pictures with large, highly organized collections indicating greater fixation on the images (Taylor, Holland, & Quayle, 2001). CP possessors with organized collections may spend hours labeling, filing, indexing, and even maintaining databases of their child-pornography pictures. They may be selective about the images they download and search through large networks of online child-pornography sites looking for specific pictures. Some collect series of still images created from videos or images of particular children, sex acts, or age groups.

We determined if CP possessors were "organized CP collectors" by asking if they "had named and organized [their] files into a collection, such as by sex or age." We found 27% of arrested CP possessors in the *N-JOV Study* fell into this category. (Table 4). Compared to other arrested CP possessors, organized CP collectors were more likely to have

- More than 1,000 graphic child-pornography images
- Child-pornography videos
- Child-pornography images in noncomputer formats like books, magazines, and photographs
- Child-pornography images of children younger than the age of 6
- Sophisticated computer systems
- Used sophisticated methods to store or hide images on their computers

**Table 4. Arrested CP Possessors: Differences Between Organized
CP Collectors and Other Arrested CP Possessors**

(Internet-Related CP Possessors, Weighted n = 1,713 and Unweighted n = 429;
Organized CP Collectors, Weighted n = 465 and Unweighted n = 136;
Other CP Possessors, Weighted n = 1,248 and Unweighted n = 293)

| Characteristics | % Internet-Related CP Possessors | % Organized CP Collectors | % Other CP Possessor |
|---|---|---|---|
| Had More than 1,000 CP Images⁺*** | 14% | 33% | 8% |
| Had CP Videos⁺**** | 39% | 55% | 33% |
| Had CP in Noncomputer Formats** | 18% | 28% | 15% |
| Had Images of Children Younger than 6⁺**** | 40% | 65% | 30% |
| Used a Sophisticated Computer System** | 7% | 13% | 5% |
| Used Technology to Hide CP Images*** | 20% | 31% | 16% |

Notes: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001. Ns and percentages may not be proportionate because results are weighted to reflect selection probabilities and some cases have more influence than others.
⁺Results may be biased because variable has more than 5% missing data.
**$p \leq .01$, ***$p \leq .001$

These differences suggest the organized CP collectors devoted more time and attention to acquiring large numbers of images and images that exploited younger children and maintaining the images securely, than did offenders who had child pornography which was not organized into collections. The two groups did not differ, however, in terms of the personal characteristics of the offenders or other crimes they committed. Organized CP collectors were not more or less likely to have sexually victimized children than were other CP possessors.

**Box 3: Description of a CP Possessor**

**Some CP possessors admitted they were sexually attracted to children.**
A man in his 30s was involved in a traffic accident, and the responding officer sent him to the hospital to be checked out. The officer then did an inventory of the man's car because it was being impounded. He found a notebook of child-pornography pictures. Law enforcement got a search warrant for the man's house, seized his computer, and found much more child pornography. The man rented a room in a house with other adults from his church. He had been married briefly, but the marriage ended in divorce because the man was impotent with his wife. The man told the investigator he was consciously avoiding children because he was afraid he would be tempted to sexually victimize a child. He pled guilty to CP possession and was sentenced to 30 days in jail and 3 years of probation and required to register as a sex offender.

## How Many Arrested CP Possessors Distributed Child Pornography?

Only 33% of arrested CP possessors were known distributors of child pornography; however, in a number of cases investigators believed offenders had distributed images but could not prove it. Some investigators noted it is difficult to prove distribution and offenders tended to deny it because admitting to distribution would have added more criminal charges. Like organized CP collectors, distributors were more likely than other CP possessors to have

- Possessed more than 1,000 graphic child-pornography images (20% of distributors versus 11% of nondistributors, p ≤ .05[11])
- Possessed child-pornography images of children younger than the age of 6 (53% versus 33%, p ≤ .000[12])
- Used sophisticated methods to store or hide images on their computers (25% versus 18%, p ≤ .01[13])

Otherwise distributors did not differ from other arrested CP possessors in terms of the child pornography they possessed, the percentage that sexually victimized children, or other characteristics.

## How Did Cases Involving CP Possession Arise in the Criminal-Justice System?

Cases involving CP possession started in several ways. Some began with reports to law-enforcement agencies by individuals who saw or found child pornography in someone's possession. Some began with reports to the CyberTipline by Internet users who received unsolicited electronic mail (E-mail) with child-pornography pictures. Some CP possession cases started with undercover investigations set up to catch people downloading or distributing child pornography online. Law enforcement, however, also discovered child pornography while investigating other crimes, especially other kinds of sex crimes committed against minors. In other words, investigations beginning with allegations of child sexual victimization sometimes uncovered offenders who also possessed child pornography. These cases involved offenders who sexually victimized children who were family members or acquaintances or adolescents they met online as

---

[11] Results may be biased because variable has more than 5% missing data.
[12] *Id.*
[13] *Id.*

well as offenders who solicited undercover investigators posing online as minors. Overall, of cases involving CP possession and ending in arrests (Figure 1)

- 53% originated as CP possession or distribution cases
- 31% arose as cases of child sexual victimization
- 16% arose as solicitations to undercover investigators posing online as minors (attempted child sexual victimization)

**Figure 1. Arrested CP Possessors: Type of Case When It First Came to the Attention of Law Enforcement**
(Weighted n = 1,713 and Unweighted n = 429)



Note: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001.

## How Often Did Cases Start With Reports From the Public, and How Often Did They Start With Investigations by Law Enforcement?

More than half of cases involving CP possession came to the attention of law enforcement through complaints by individuals (57%), but a sizeable number also originated with investigations by law enforcement (43%) (Table 5).

**Table 5. Arrested CP Possessors: Involvement of Law-Enforcement Agencies
Based on Whether the Case Originated as Child Sexual Victimization,
Solicitation to an Undercover Investigator, or CP Possession**

(CP Possession Cases, Weighted n = 1,713 and Unweighted n = 429;
Originated as Child Sexual Victimization, Weighted n = 530 and Unweighted n = 135;
Originated as Solicitations to Undercover Investigators, Weighted n = 277 and Unweighted n = 69;
Originated as CP Possession, Weighted n = 906 and Unweighted n = 225)

| | % Internet-Related CP Possession Cases | Originated as Child Sexual Victimization | Originated as Solicitation to UC Investigator | Originated as CP Possession |
|---|---|---|---|---|
| How Case Originated | | | | |
| Report by Individual | 57% | 98% | 3% | 50% |
| Law-Enforcement Activity | 43% | 2% | 97% | 50% |
| Type of Agency Where Case Originated | | | | |
| Federal | 25% | 2% | 31% | 38% |
| ICAC Task Force* | 11% | 9% | 23% | 8% |
| Other State or Local | 60% | 87% | 41% | 51% |
| Other Type | 3% | 3% | 5% | 3% |
| Numbers of Agencies Involved in Case | | | | |
| 1 | 17% | 15% | 14% | 18% |
| 2 | 35% | 37% | 39% | 32% |
| 3 | 34% | 35% | 35% | 33% |
| 4 or More | 15% | 13% | 12% | 17% |
| Types of Agencies Involved in Case | | | | |
| Federal | 53% | 35% | 68% | 60% |
| ICAC Task Force* | 37% | 32% | 38% | 39% |
| Other State or Local | 81% | 93% | 71% | 77% |
| A Federal Agency or ICAC Task Force* Was Involved | | | | |
| Yes | 70% | 59% | 85% | 72% |
| No | 30% | 41% | 15% | 28% |
| Arrest by > 1 Agency | | | | |
| Yes | 23% | 21% | 25% | 23% |
| No | 77% | 79% | 75% | 77% |
| Jurisdiction Bringing Charges | | | | |
| State Only | 75% | 82% | 75% | 72% |
| Federal Only | 15% | 7% | 17% | 19% |
| State and Federal | 9% | 11% | 7% | 8% |

* ICAC Task Forces were not yet fully operational during the time frame of this study.

Notes: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001. Some percentages do not add to 100% because of rounding or missing data. Ns and percentages may not be proportionate because results are weighted to reflect selection probabilities and some cases have more influence than others. Missing data are shown when they exceed 5%. Most missing values are because investigators did not have complete information in every case.

**Cases Starting With Reports by Individuals**  Fifty-seven percent of cases began with reports by individuals either through allegations of CP possession or child sexual victimization. In cases **beginning with allegations of CP possession**, reporters tended to be spouses, roommates, or others who came across child pornography on computers. Some reporters came across child pornography during activities like casual sex or cybersex with individuals they did not know well and were disturbed enough to report the incidents to law enforcement. Other complaints came from businesses or organizations that either found child pornography on a computer they were repairing, renting, or reselling or discovered an employee had used a business computer to download or store child pornography.

In CP possession cases **beginning with allegations of child sexual victimization**, reports to law enforcement often arose from disclosures by victims or observations by alert family members or other individuals. In some cases victims told parents, other adults, or friends, who reported crimes to law enforcement. Concerned individuals who noticed suspicious or troubling relationships between adults and youth also reported some cases.

**Cases Starting With Law-Enforcement Investigations**  The remaining 43% of CP possession cases arose from law-enforcement activity. More than one-third (36%) of all cases studied arose from 2 types of Internet-related undercover investigations, solicitations to undercover investigators posing online as minors and undercover investigations of the child-pornography trade.

- Law-enforcement investigations involving drugs, weapons, or other nonsexual crimes accounted for 5%
- Investigations by parole or probation supervisors accounted for 1%

## Where in the Criminal-Justice System Did CP Possession Cases Arise?

CP possession cases ending in arrest involved a wide range of law-enforcement agencies. These cases arose at all levels of law enforcement, with

- 25% originating in federal agencies
- 11% in ICAC Task Forces (which were not yet fully operational during the time frame of this study)
- 60% in other state, county, or local agencies not connected to an ICAC Task Force
- 3% in other agencies such as international or administrative agencies

State and local agencies were vital responders to CP possession crimes and active in Internet-related undercover operations. Cases originating as child sexual victimization or CP possession investigations started most often in state and local agencies (87% and 51% respectively). Also 41% of the CP possession cases beginning as solicitations to undercover investigators started at this level.

While most CP possession cases began at the state and local level, however, it appears these agencies often looked to federal agencies and ICAC Task Forces for assistance and support

- The great majority of CP possession cases (84%) involved more than 1 law-enforcement agency
- More than half (53%) involved a federal agency, and 37% involved ICAC Task Forces (which were not yet fully operational during the time frame of this study)
- In 23% of cases CP possessors were arrested by more than 1 agency
- Most CP possessors were charged with state crimes only (75%), but they were charged with federal crimes in approximately a quarter of cases (24%)

So while most cases began at the local and state level, they almost always expanded to include other agencies and slightly more than half involved at least some assistance from federal agencies.

## Dual Offenders: How Often Did Offenders Both Sexually Victimize Children and Possess Child Pornography?

Many CP possessors were what we have termed "dual offenders." They sexually victimized children and possessed child pornography, with both crimes discovered in the course of the same investigation. Some of these dual offenders were discovered in cases starting as investigations of child sexual victimization and turning up child pornography. Others were discovered in cases starting as investigations of child pornography and detecting a sexually victimized child.

Law-enforcement agencies active in investigations of Internet-related sex crimes committed against minors have reported the proportion of arrested offenders who both sexually victimized children and possessed child pornography was high, ranging from 35% to 51% when prior offenses also were counted (Armagh, 2002). We found 40% of the cases involving CP possession in the *N-JOV Study* involved dual offenses of CP possession and child sexual victimization detected in the course of the same investigation. All of these offenders had identified child victims. An additional 15% both possessed CP and **attempted** to sexually victimize children by soliciting undercover investigators posing online as minors. When these cases of attempted child sexual victimization are counted, 55% of the CP possessors were dual offenders (unweighted n = 241, weighted n = 936).

### How Many Dual Offenders Were Found in Investigations Beginning As Allegations or Investigations of Child Pornography?

Most of the dual offenders (55%) were detected in investigations beginning as allegations of child sexual victimization (Figure 2). Twenty-nine percent were

detected in investigations beginning with undercover investigators posing online as minors. When we looked at all of the cases originating as allegations or investigations of CP possession and examined how many resulted in the arrests of dual offenders, we found

- In 14% of cases investigators found dual offenders who both possessed child pornography and sexually victimized children
- In 2% of cases investigators found offenders who possessed child pornography and attempted to sexually victimize children by soliciting undercover investigators posing online as minors
- 84% of cases involved CP possession but investigators did not detect concurrent child sexual victimization or attempts at child victimization

**Figure 2. Arrested Dual Offenders: Type of Case When It First Came to the Attention of Law Enforcement**

(Weighted n = 936 and Unweighted n = 241)



Note: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001.

This means one out of six cases originating with an allegation or investigation of child pornography discovered a dual offender who had also sexually victimized children or attempted to do so. This was a high rate of detection, especially considering this is a conservative number. We only counted cases where charges for child sexual victimization were pursued concurrent to CP possession charges. We did not count cases where investigators had strong suspicions about sexual victimization but could not prove them or where victims came forward but charges were not pressed because of the passage of time or for other reasons. Also it is likely some of the CP possessors sexually victimized children in crimes that were unknown to the investigators at the time they were interviewed. For example some victims may have come forward in other jurisdictions or during prosecution phases of cases. Also some CP possessors who were evaluated and treated as sexual offenders may have revealed child sexual victimizations during

treatment. Further some of the law-enforcement agencies in these cases may not have had protocols triggering investigators to assess the possibility CP possessors had also sexually victimized children. Given these factors, the number of dual offenders among arrested CP possessors could be considerably greater than one in six.

**Box 4: Description of a CP Possessor**

> **Some dual offenders came to the attention of law enforcement in cases that began with allegations or investigations of CP possession.**
>
> A 28-year-old man came to the attention of law enforcement from 2 sources on the same day. He was the target of an undercover investigation through which he ordered child pornography, and his employer reported finding child pornography on his work computer. Law enforcement also found child pornography on his home computer. He had hundreds of images, including videos, mostly of girls in the 6- to 12-year-old range. The man was a girls' gymnastics coach. Further the investigation stirred memories in the man's sister that he had sexually victimized her in her childhood, which he was charged with and confessed to. He received three years of probation after pleading guilty to CP possession. The sexual victimization charges were treated as a separate case, for which he was sentenced to 12 years in prison. He will be required to register as a sex offender upon his release.

## How Many Dual Offenders Used Child Pornography to Seduce or Groom Minors?

Many people are concerned those who sexually victimize children are using child pornography to seduce or groom their victims. To assess this interviewers asked whether offenders had shown or given child pornography to any minors. We found

- 27% of dual offenders had shown or given child pornography to identified victims
- An additional 9% of dual offenders had sent child pornography to undercover investigators posing online as minors
- Overall 36% of dual offenders showed or gave child pornography to identified victims or undercover investigators posing online as minors

When offenders had shown or given child pornography to victims or undercover investigators, interviewers also asked whether they had used the child pornography to "groom" victims, defined as to "interest a victim in or overcome inhibitions about sexual activity." We found 25% of dual offenders had used child pornography to groom. In the remaining cases, while investigators knew an offender had shown child pornography to a victim, they did not know whether an offender's purpose was to groom.

**How Many Dual Offenders Were Found in Other Types of Internet-Related Sex Crimes Committed Against Minors?**

There were two types of inherently Internet-related sex crimes committed against minors described in the *N-JOV Study*. The first type was Internet-initiated crimes or "online meeting" cases involving identified victims who met offenders online. The second type involved offenders who used the Internet to solicit undercover investigators posing online as minors. These solicitations were attempts at child sexual victimization. Child-pornography possession was common among offenders in both of these types of cases.

■ 39% of arrested offenders who met victims online possessed child pornography

■ 43% of offenders who solicited undercover investigators posing online as minors possessed child pornography.[14]

**Box 5: Description of a CP Possessor**

> **Some dual offenders came to the attention of law enforcement in cases that began with allegations or investigations of child sexual victimization.**
> A 15-year-old girl met a man in a chatroom. They talked online for about one month, and then he asked her to meet him, offered her money to have sex with him, and sent her pornography. The girl told a friend, who persuaded her to tell her mother, who notified law enforcement. The girl helped law enforcement arrange a meeting with the man, who was arrested when he showed up at the meeting place. His computer was seized. He had a large collection of child pornography, including many video clips of adult men sexually victimizing young girls. Law enforcement also found evidence he had communicated with many other young girls on the Internet throughout the U.S. and Europe, although they could only identify 1 other girl, who was 16. The offender was 25 and a wealthy business owner who had a longtime girlfriend. He was charged with several felonies, convicted at trial, sentenced to 68 months in prison and 4 years parole, and fined $5,000. He will be required to register as a sex offender when he is released.

## How Did CP Possession Cases Fare At Prosecution?

Overall, prosecutions in CP possession cases were very successful. The prosecutorial outcomes were known in 88% of the CP possession cases examined (Table 6). Because we thought the judicial system would treat dual offenders more severely than the other CP possessors, we compared those two groups to see if outcomes differed. In cases with known outcomes, almost all of the CP possessors who were not dual offenders (94%) were convicted of or pled guilty to crimes in either state or federal courts, although we do not know exactly what crimes they were convicted of or pled to. Ninety-seven percent of the dual offenders were convicted or pled guilty. Charges were dropped or dismissed in 5% of the CP possessor-only cases and 3% of dual-offender cases. Sometimes

---

[14] These percentages are based on the 508 (weighted) arrested offenders involved in online meeting crimes and the 702 (weighted) who solicited undercover investigators posing as minors.

charges were dropped in one jurisdiction because cases were being pursued in other jurisdictions. None of the CP possessors was acquitted at trial, whether or not they were dual offenders.

Fifty-nine percent of arrested CP possessors were incarcerated for some period, with dual offenders more likely than other CP possessors to be incarcerated (68% versus 48%, respectively). Eighty-four percent of arrested CP possessors were required to register as sex offenders as a result of their convictions. Rates of required sex-offender registration were higher among dual offenders (94%) than CP possessors who were not dual offenders (71%).

While dual offenders were more likely to be sentenced to incarceration than arrested CP possessors only, similar numbers were sentenced to less than 1 year (15% of dual offenders and 17% of other arrested CP possessors, as shown in Figure 3) and to between 1 and 5 years (22% of dual offenders and 25% of others). Dual offenders, however, were considerably more likely to receive sentences of 5 years or longer (28% versus 4% of others, $p \le .000$). It is hard to generalize about the sentencing differences and similarities because these cases represent the full spectrum of law-enforcement jurisdictions in the U.S. and the crimes committed by the dual offenders vary greatly in terms of the types of sexual victimizations perpetrated, ages of victims, and nature of offender-victim relationships. It is notable, however, that arrested CP possessors rarely escaped conviction and most were incarcerated for some period, with more than one-quarter of dual offenders serving five years or more.

**Table 6. Arrested CP Possessors: Prosecutorial Outcomes in Cases With Known Dispositions**

(CP Possessors With Known Outcomes, Weighted n = 1,510 and Unweighted n = 375;
Dual Offenders With Known Outcomes, Weighted n = 833 and Unweighted n = 210;
CP Possessors Only With Known Outcomes, Weighted n = 677 and Unweighted n = 165)

| Characteristics | % Internet-Related CP Possessors With Known Outcomes | % Dual Offenders With Known Outcomes | % CP Possessors Only With Known Outcomes |
|---|---|---|---|
| Outcome of Arrest | | | |
| Guilty Plea | 88% | 86% | 90% |
| Convicted at Trial** | 8% | 11% | 4% |
| Dropped or Dismissed | 4% | 3% | 5% |
| Acquitted | 0% | 0% | 0% |
| Sentence | | | |
| Any Incarceration*** | 59% | 68% | 48% |
| Any Probation*** | 53% | 41% | 68% |
| Required to Register as Sex Offender*** | 84% | 94% | 71% |

Notes: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001. Case outcomes were pending or unknown for 12% of cases. Some percentages do not add to 100% because of rounding or missing data. Ns and percentages may not be proportionate because results are weighted to reflect selection probabilities and some cases have more influence than others.
**$p \le .01$, ***$p \le .001$



**Figure 3. Arrested CP Possessors: Length of Time Incarcerated for Dual Offenders Compared to CP Possessors Only**
(Weighted n = 1,270 and Unweighted n = 306)

Note: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001. Note: We did not know the length of the sentence in about 16% of cases.

## What Impact Has the *Ashcroft vs. Free Speech Coalition* Decision Had on State and Local Prosecutions for Possession of Child Pornography?

The *N-JOV Study* collected information about arrests for CP possession occurring before the April 2002 U.S. Supreme Court ruling in *Ashcroft vs. Free Speech Coalition*. Prior to the *Free Speech Coalition* ruling, prosecutors had to prove CP images met statutory requirements regarding the ages of the children depicted and the sexual explicitness of the pictures. The *Free Speech Coalition* ruling added an additional requirement. Now prosecutors must also show that the children depicted are real and not "virtual" images generated by computer. This virtual-image defense has raised consternation among some law-enforcement agents and prosecutors, who worry it will be difficult to counter, hamper efforts to combat child pornography, and result in fewer arrests and prosecutions.

The *Free Speech Coalition* ruling applied to federal prosecutions, but it also affected state and local prosecutions in a number of states because many state CP possession laws are modeled after the federal statute questioned in the case. Moreover, the *N-JOV Study* found 75% of arrested CP possessors were prosecuted at the local and state level. We were able to assess the initial impact of the *Free Speech Coalition* ruling by speaking with state and local prosecutors.

## Prosecutor Interviews

In addition to interviewing law-enforcement investigators, the *N-JOV Study* conducted supplemental interviews with 207 state and local prosecutors about how cases described by investigators fared at the prosecution level. Of these prosecutors, 102 stated they were familiar with the *Ashcroft vs. Free Speech Coalition* decision and could answer questions about how it affected the prosecution of CP possession cases in their offices. These prosecutors were from 61 jurisdictions in 27 states. Eighty-four percent of their interviews were conducted in April, May, and June of 2003 about 1 year after the *Free Speech Coalition* decision was rendered. The other interviews were done earlier, between December 2002 and March 2003.[15]

The *Free Speech Coalition* ruling did not affect all state and local prosecutors equally. Some said the ruling did not apply to them because the CP possession statutes in their states were not worded similarly to the federal statute. Some prosecutors came from states where the virtual-image defense had been in effect prior to the *Free Speech Coalition* ruling.

About 1 year after the ruling, 40% of the state and local prosecutors said the virtual-image defense had been raised in CP possession cases in their offices, but only 5% had seen cases go to trial (Table 7). In the cases that went to trial, the prosecutors used several strategies to counter the virtual-image defense including

- Having a federal law-enforcement agent testify to the origins of the images
- Having a forensics expert compare CP images to virtual images and testify that the CP images were not virtual
- Presenting a doctor's affidavit that the children were real and having the jury decide whether the pictures depicted real children

---

[15] More details about the prosecutor interviews can be found in the *N-JOV Methodology Report*, available online at the web site for the Crimes against Children Research Center at www.unh.edu/ccrc. We did not interview federal prosecutors because we were unable to resolve our request for permission from the U.S. Attorney Executive Office before the end of the field period of the study.

**Table 7. Impact of *Free Speech Coalition* Decision on State and Local Prosecutors' Offices**

(Unweighted n = 102*)

| Since *Free Speech* Decision, Prosecutor's Office… | % Prosecutors |
|---|---|
| Has Had Cases Involving Virtual-Image Defense | 40% |
| Has Had Such Cases Go to Trial | 5% |
| Is Prosecuting Fewer CP Possession Cases | 4% |
| Is Not Pursuing Some Cases It Would Have Previously Pursued | 9% |
| Is Using These Tactics For Dealing With *Free Speech* Decision | |
|     Consulting With Federal Agencies to Identify Children | 64% |
|     Consulting With Other Sources to Identify Children | 56% |
|     Using Obscenity Laws to Prosecute CP Cases | 25% |
|     Using Experts to Testify That Images Are Not Computer Generated | 30% |
|     Letting The Jury Decide | 11% |
| Has Been Affected by Judges' Decisions Interpreting *Free Speech* | 15% |
| **Policies, Experience, and Training** | |
| Office Has Specific Policies for Handling CP Possession Cases | 28% |
| These Policies Include Requirement of… | |
|     Threshold Number of Images | 1% |
|     Defined Level of Development of Children Depicted in Images | 12% |
|     Defined Level of Explicitness | 12% |
|     Identification of Children in Images | 1% |
|     Other Requirement | 13% |
| Experience With Prosecutions of Internet-Related Sex Crimes Committed Against Minors | |
|     1 to 6 Cases | 27% |
|     7 to 15 Cases | 27% |
|     16 to 40 Cases | 29% |
|     More Than 40 Cases | 18% |
| Respondent Has Received Training About Prosecuting Internet-Related Crimes | 75% |
| Training Was From… | |
|     National District Attorneys Association or American Prosecutors Research Institute | 36% |
|     NCMEC or U.S. Department of Justice | 39% |
|     Other Federal Agency | 16% |
|     State or Local Agency | 34% |
|     Other | 25% |

*Statistics derived from interviews with prosecutors are not weighted. No variable has more than 5% missing data.

Only 4% of state and local prosecutors said their offices were pursuing fewer CP possession cases because of the *Free Speech Coalition* ruling. One of these said the CP possession statute in his state had been essentially voided and was not yet replaced at the time he was interviewed. Nine percent of prosecutors said their offices were not pursuing some cases they previously would have pursued. Some noted that many CP possessors had committed other sex crimes against minors, and charging was now focused on these other crimes. (These are the dual offenders referred to earlier in this report.) One of the prosecutors whose

office was bringing fewer cases said having to identify a child "takes a lot of resources we don't have. Often we go with other charges and [don't] bother with possession of CP charges."

## Prosecutor Tactics

We asked state and local prosecutors what tactics they were using to counter the virtual-image defense. Most were consulting with federal agencies (64%) or other agencies (56%) to attempt to identify the children depicted in the images. Thirty percent were using experts to testify images were not computer generated. One-quarter of the offices said they had used obscenity laws to prosecute child-pornography cases. Prosecutors described some specific tactics including

- Using investigating officers to testify they had determined the identities of victims, including images belonging to known series
- Using investigating officers to testify images dated back to before virtual images were possible
- Using experts in computer graphics software to testify CP images were not virtual
- Bringing charges based on videos because it was easier to show videos were not computer generated
- Training investigators to elicit statements from CP possessors that they were looking at images of real children
- Using the assistance offered by NCMEC about known images
- Giving preference to cases with victims who had been previously identified
- Pursuing CP possession as an aggravating factor in cases of child sexual victimization
- Treating labels with the names and ages of children written on pictures by CP possessors as admissions the children were real

Some state and local prosecutors expressed confidence in the basic strength of CP possession cases and the reluctance of many defendants to go to trial. One said, "We have experts lined up to testify, but then the [defendants] always plead." Another said, "When [the] defense has brought [the virtual-image defense] up, we say, 'Our guy says they're not fake,' and that's the end of it."

## Protocols for CP Possession Cases

Only 28% of the state and local prosecutors said their offices had specific protocols for CP possession cases. Most of the protocols incorporated statutory standards that detailed the types of images and ages of victims required before images could be defined as child pornography. The protocols also often specified how CP images were to be handled, including safeguards about access to images and procedures governing discovery. A few of the state and local prosecutors said they had to make an initial assessment that the images appeared to be of real children before they could proceed with a case.

## Early Conclusions About the Impact of the Ruling in State and Local Courts

This information about state and local prosecution tactics after the *Free Speech Coalition* ruling provides a snapshot of how prosecutors reacted to the ruling. This picture may have changed considerably based on how courts have interpreted the decision since our interviews. Also this was not a representative sample, and many of the prosecutors we interviewed had specialized training in and considerable experience with Internet-related, child-exploitation prosecutions. They may have responded more quickly and confidently to the ruling than other prosecutors. Nonetheless we have drawn some tentative conclusions from their reflections about the initial impact of the *Free Speech Coalition* decision

- Child-pornography images are still strong and disturbing evidence
- It is doubtful the virtual-image defense will encourage large numbers of offenders to go to trial; most will still plead guilty
- Eliciting statements from CP possessors about the realness of images is one way to counter the virtual-image defense
- Some jurisdictions interpreted the *Free Speech Coalition* ruling to mean children must be identified by name, but some used forensic evidence and other means to show CP images were not virtual
- Some states are not affected by the ruling, which could mean that some prosecutions may shift from federal jurisdictions to state, if federal prosecutors are hampered by the *Free Speech Coalition* ruling
- While some fear the virtual-image defense will impair the ability of prosecutors to bring CP possessors to justice, there may be a beneficial consequence to the *Free Speech Coalition* ruling. A number of the prosecutors we interviewed were frustrated that some judges did not view CP possession as a serious crime. Hearing testimony about the realness of the pictures and the names of the children victimized by CP possession may underscore to judges the reality of the crimes these children suffered and counter the tendency of some to minimize the severity of CP possession.

These reflections about the impact of the *Free Speech Coalition* ruling are optimistic and suggest the ruling may be less of a problem than some have predicted because of the resourcefulness of the state and local prosecutors involved in these cases and the resiliency of the litigation process. It is too soon to evaluate the overall impact of the *Free Speech Coalition* decision, particularly because we did not have feedback from federal prosecutors, who are most likely to be affected by the first effects of the decision. The case law is developing rapidly (Kreston, 2004).

# Major Findings and Conclusions

**The *N-JOV Study* estimates there were 1,713 arrests for Internet-related sex crimes involving CP possession in the 12 months beginning July 1, 2000.** While this number is small compared to our estimate of 65,000 arrests in 2000 for sexual assaults of all types committed against minors, indications are that law-enforcement activity and consequently arrests for CP possession will increase. The growth of this crime is linked with the growth in use of the Internet, which has allowed the widespread and anonymous distribution of child pornography and permitted CP possessors to easily access illegal images from their homes.

As Internet use continues to grow, so does law-enforcement activity. Since the time frame of the *N-JOV Study*, the expertise and specialization in Internet Crimes Against Children Task Forces has continued to expand and more state and local law-enforcement agencies have received training in investigating Internet child sexual exploitation crimes through programs funded by the U.S. Department of Justice and other sources. These factors may be increasing the number of arrests for CP possession in Internet-related crimes.

At the same time some factors may be hampering the law-enforcement response to child pornography. One such factor may be a movement of resources in federal and other agencies from combating child exploitation to anti-terrorism. Another may be the Supreme Court decision in *Ashcroft vs. Free Speech Coalition*, which occurred after the time frame of the *N-JOV Study*. This decision, which requires prosecutors to prove child-pornography images are pictures of real children and not computer generated, may have made child-pornography cases harder to prosecute, which could decrease arrests. The *N-JOV Study* establishes a baseline number of arrests against which future growth or declines attributable to these and other factors can be measured.

**CP possession is a serious crime.** The *N-JOV Study* documents the inherent seriousness of CP possession. More than 80% of arrested CP possessors had images of prepubescent children, and 80% had images of minors being sexually penetrated. Approximately 1 in 5 (21%) arrested CP possessors had images of children enduring bondage, sadistic sex, and other sexual violence. More than 1 in 3 (39%) CP possessors had videos depicting child pornography with motion and sound.

Although their identities are often unknown, many of the children in these graphic images were sexually victimized and assaulted. Those who possess these pictures – for sexual gratification, curiosity, as a means of profit, or for other reasons – are adding to the burdens of these young victims, whose trauma may be increased by knowing their pictures are circulating globally on the Internet with no hope of permanent removal or could be entered into circulation in the future.

**CP possessors were a diverse group.** While the great majority were men older than 25 who had graphic images and images of prepubescent children, there was considerable variety among arrested CP possessors. Many were older than 40, but some were juveniles. Their incomes ranged from poverty to wealth and their levels of education ran the gamut. Many had fewer than 100 graphic images, but some had more than 1,000. More than one-quarter maintained organized child-pornography collections, but most did not. One-third were known child-pornography distributors, but investigators noted that distribution was often hard to prove. Some committed other sex crimes against minors besides CP possession. A few were diagnosed as being mentally ill or had diagnosed sexual disorders, some had identified drinking or drug problems, and there was evidence that some were involved in other kinds of deviant sexual activities not involving children like bestiality and sadism. But many were not in any of these categories. The *N-JOV Study* does not provide data about the motivations of CP possessors or the sequences of their offenses, but it does give a picture of diversity suggesting a variety of motives and varying levels of involvement with child pornography among arrested CP possessors. Any profiling of such offenders needs to take such diversity into account.

**Use of sophisticated technology was uncommon among arrested CP possessors.** Most CP possessors in the *N-JOV Study* did not use sophisticated methods to hide their images or identities; however, these findings pertain only to arrested CP possessors. Some argue law enforcement is nabbing the newest, least sophisticated, or most impulsive CP possessors while the technologically savvy go undetected (Jenkins, 2001). Not all CP possessors, however, may be technologically savvy. Researchers simply do not have enough information to evaluate the relationship between technological sophistication and detection.

**In a considerable number of cases law enforcement found "dual offenders" who both sexually victimized children, or attempted to, and possessed CP, with both crimes discovered in the same investigation.** Dual offenders were particularly likely to be uncovered in investigations involving online meetings with youth and solicitations to investigators posing online as minors. Further, one out of six CP possession cases beginning with an investigation of or allegation about CP possession discovered a dual offender who had also sexually victimized a child or attempted to do so.

**Reports from individuals outside of law enforcement played an important role in bringing CP possession to the attention of law enforcement, including cases coming to light as sexual victimizations of children and CP possession.** More than half of CP possession cases began with reports from individuals to law enforcement. This response from individuals underscores the importance of education to create public awareness and encourage reporting of CP possession. It is also important to note some of the reporters in these cases discovered child pornography while engaged in what many would consider aberrant sexual situations. Awareness should be promoted

not just among law enforcement, child-welfare advocates, parents, and guardians, but also among people who may come across child pornography because they are exploring Internet sex sites or engaged in unconventional sexual situations.

**Internet-related CP possession cases arose at all levels of law enforcement.** CP possession cases both arose at all levels of law enforcement and tended to involve multiple jurisdictions, multiple agencies, and cooperation between federal and state or local agencies. Agencies at all levels need to keep up with advances in technology and maintain staff trained in specialized investigation methods to respond to these cases. Further, federal agencies or ICAC Task Forces were involved in 70% of CP possession cases indicating state and local agencies were making good use of the resources afforded by the U.S. Department of Justice.

**Conviction rates may be higher for Internet-related CP possession cases than for conventional child-sexual-victimization cases.** Almost all of the CP possessors in cases with known outcomes were convicted of crimes in either state or federal courts. This was true of both CP possessors who were dual offenders (97%) and those who were not (94%). None of the CP possessors were acquitted. In comparison "conventional" child-sexual-victimization cases not involving the Internet average 22% dismissals before prosecution and 6% acquittals. Rates of incarceration for CP possessors (59%) are similar to those for conventional cases of child sexual victimization, about 56%, although there is wide variation among jurisdictions (Cross, Walsh, Simone, & Jones, 2003). More of the dual offenders, 68% versus 48% of CP possessors only, served time. This certainly suggests the criminal-justice system is treating CP possession seriously.

**Advances in technology do not necessarily give advantages to criminals over law enforcement.** Some observers have emphasized how the Internet has provided new opportunities for criminal activity such as easier access to both children and child pornography. As technology evolves at a rapid speed, law enforcement is concerned about products being developed that are specifically designed to provide a greater degree of anonymity for offenders and decrease their risk of detection. Recognizing that while evolving technology may raise additional challenges in law enforcement's investigation of these cases, technological developments also have given new tools and advantages to law enforcement. Examples include the complex databases and software that scan for child-pornography images, increased ability to engage in undercover activity, and the ability to track electronic trails and evidence left by offenders as they communicate and surf online. The high conviction rates for arrested CP possessors observed in this study may be testimony to the quality of evidence law enforcement is able to accumulate in Internet-related cases. Graphic images depicting the sexual penetration of children provide conclusive criminal evidence in CP possession cases. They may also strongly reduce ambiguity about offenders' motives and actions as well as corroborating victim testimony in some cases of child sexual victimization.

# Limitations

The *N-JOV Study* is the first research gathering information about a national sample of arrested CP possessors. Data from a national sample is a strength of the *N-JOV Study*, but like every scientific survey, the study also has limitations. Readers should keep some of these important things in mind when considering the findings and conclusions of this study.

First, some errors and biases may have been introduced because we interviewed law-enforcement investigators. We regarded these respondents as the best sources for in-depth information about the nature of Internet-initiated crimes because their professional responsibilities require them to gather extensive information about these cases. The information they provided, however, could be biased by training, professional attitudes, or the adversarial nature of their roles in some of these cases.

Second, the findings of the study apply only to CP possessors who were arrested for Internet-related sex crimes committed against minors. We do not know if these arrested CP possessors were representative of all Internet-related CP possessors. It is highly likely there were Internet-related CP possessors during that period of time who were undetected by law enforcement. It is also possible some Internet-related CP possessors were detected during that period of time but not arrested. Because of this, our findings, particularly those regarding dual offenders and CP possessors who used sophisticated technical methods to store child pornography cannot be interpreted to apply to offenders who were not detected or arrested or those who committed sex crimes that were not Internet-related. Moreover, the arrests for Internet-related sex crimes committed against minors examined in the *N-JOV Study* comprised only a small portion of the overall number of arrests for sex crimes committed against minors that happened during the time frame of this study, making it impossible to draw any conclusions about relationships between CP possession and sex crimes committed against minors overall.

Third, there is an additional caution to our findings about dual offenders. Knowing a considerable number of dual offenders were discovered during investigations of Internet-related, child-sexual-victimization and CP possession cases does not explain how possessing child pornography is related to child sexual victimization or whether it causes or encourages such victimization. We did not have the data to determine this. In particular we had no information about the sequencing of the crimes committed by dual offenders or about undetected crimes they may have committed and little information about their criminal histories and how they used the child pornography they possessed.

# Recommendations

# Appendix: More About the Methodology of the *N-JOV Study*

**Overview**

First we surveyed a national sample of 2,574 local, county, and state law-enforcement agencies by mail asking them if they had made arrests in Internet-related, child-pornography, or sexual-exploitation cases. Then we conducted detailed telephone interviews with investigators who had such cases. Two out of the four federal agencies specializing in Internet crimes participated in the telephone interviews, but not the mail survey. The methodology was modeled after the one used in the second *National Incidence Study of Missing, Abducted, Runaway, and Thrownaway Children* to survey law-enforcement agencies about child-abduction cases.

**How the Mail Survey Sample Was Created**

We created a stratified sample of law-enforcement agencies to get information from agencies specializing in Internet-related sex crimes committed against minors and still allow every agency a chance to be selected in the sample. To do this the agencies were divided into the three groups noted below.

- Agencies specializing in investigating Internet-related sex crimes committed against minors. These included 75 investigative agencies that made up the 73 Internet Crimes Against Children Task Forces and satellites, in operation when the sample was drawn, funded by grants from the U.S. Department of Justice. (Some of the Task Forces and satellites were just beginning operations and were not yet fully operational during the time frame of this study.)
- A random sample of 833 agencies known to have sent staff members to training classes addressing Internet-related sex crimes committed against minors drawn from lists provided by training organizations.
- A random sample of 12% of all other U.S. local, county, and state law-enforcement agencies (n = 1,666) drawn from an annually updated directory of all U.S. law-enforcement agencies.

Eighty-eight percent of the agencies (n = 2,270) receiving mail surveys responded. Seventeen percent of the agencies responding (n = 385) reported a total of 1,723 arrests (unweighted) for Internet-related sex crimes of all types.

**Follow-Up Telephone Interviews**

We conducted telephone interviews on all eligible cases with known victims or coming from agencies reporting three or fewer cases. When agencies reported four or more cases, we selected a random subsample of cases for telephone interviews. To be eligible cases had to have victims younger than 18; involve arrests between July 1, 2000, and June 30, 2001; and be Internet-related.

Of the 796 cases in the sample, interviews were completed for 79% (n = 630). Of the 21% not completed, 13% involved agencies that did not respond to

requests for interviews, 3% involved respondents who refused to be interviewed, and 5% involved duplicate cases or cases that could not be identified. The 630 completed interviews were reduced to 612 cases because 18 interviews duplicated other completed interviews.

## Weighting Procedures

Weighting takes into account sampling procedures and nonresponse, allowing use of the data to project estimated annual arrest totals with 95% confidence that the accurate number will fall within a specific range. The arrest estimate and the other weighted estimates shown in the figures and tables and described in the text were projected from 429 cases multiplied by weights calculated based on the sampling procedures and response rates from both the mail and telephone surveys described above. Table 8 provides the unweighted and weighted numbers, with confidence intervals, for the sample and subsamples used in this report. Details of the weighting calculations are available from the authors through the Crimes against Children Research Center web site at www.unh.edu/ccrc.

#### Table 8. Arrested CP Possessors: Numbers of Cases in Sample and Subsamples, Weighted and Unweighted

| Sample or Subsample | Unweighted n | Weighted n | 95% Confidence Interval* |
|---|---|---|---|
| Internet-Related CP Possessors | 429 | 1,713 | 1,578-1,847 |
| Organized CP Collectors | 136 | 465 | 389-542 |
| CP Distributors | 142 | 566 | 474-657 |
| Origin of CP Possession Cases | | | |
|   Originated as CP Possession | 225 | 906 | 805-1,008 |
|   Originated as Child | | | |
|     Sexual Victimization | 135 | 530 | 459-601 |
|   Originated as Solicitation to | | | |
|     Undercover Investigator | 69 | 277 | 188-365 |
| Dual Offenders | 241 | 936 | 822-1,050 |
| Offenders Who Met Victims Online** | 129 | 508 | 418-599 |
| Offenders Who Solicited Undercover | | | |
|   Investigators Posing Online as Minors** | 143 | 702 | 392-1,012 |
| CP Possession Cases With Known Outcomes | 375 | 1,510 | 1,417-1,602 |
|   Dual Offenders | 210 | 833 | 742-924 |
|   CP Possessors Only | 165 | 677 | 586-767 |
| No Incarceration | 88 | 416 | 316-516 |
|   Dual Offenders | 25 | 150 | 66-234 |
|   CP Possessors Only | 63 | 266 | 201-331 |
| CP Possessors Sentenced to Incarceration | 231 | 891 | 801-983 |
|   Dual Offenders | 154 | 565 | 504-627 |
|   CP Possessors Only | 77 | 326 | 268-385 |

Note: Estimate based on a survey of 2,574 local, county, and state and 2 federal law-enforcement agencies involving arrests between July 1, 2000, and June 30, 2001.
*The confidence intervals constitute margins of error. They are calculated separately for each group using a statistical formula based on the weighted number of cases in the group. Lower and upper limits for subgroups will not sum to group lower and upper limits.
**Some of these offenders were not CP possessors.

**How *N-JOV* Researchers Asked About Child Pornography**

To determine whether cases involved Internet-related child pornography, *N-JOV* interviewers asked law-enforcement investigators, "At any point, did this case involve the possession, distribution, or production of child pornography," followed by a series of questions about how the child pornography was related to the Internet. ("Was the child pornography found on a hard drive; on removable media like CDs or disks; ordered, bought, sold, or distributed online; or was the Internet used in some other way?") A second similar series of questions determined whether the case involved production, possession, and/or distribution.

To determine whether cases involved child sexual victimization, *N-JOV* interviewers asked two questions. First, if the crime involved the distribution or production of child pornography, interviewers asked, "At any point, did the production (or distribution) involve crimes against one or more specific identified minor victims? (I mean a victim who was identified, located, and contacted.)" Second, in all cases, interviewers asked, "At any point, did this crime involve a sexual offense against an identified minor (in addition to the victim[s] of the child-pornography charges already mentioned)? I mean a victim who was located and contacted." Cases where investigators gave affirmative answers to either of these questions were considered to involve child sexual victimization.

Researchers asked a series of follow-up questions about all cases described by law-enforcement investigators as involving possession or distribution of child pornography. Examples of questions used to ask about characteristics of arrested CP possessors include

- At the time of the crime, did the offender have a diagnosed mental illness, as far as you know?
- Has the offender ever been clinically or medically diagnosed as a pedophile or as having another sexual disorder, as far as you know?
- Was there any paraphernalia or other evidence that the offender is sexually deviant in ways that don't involve children? I mean things like bestiality, bondage, or sadism to name a few.
- At the time of the crime, did the offender have any problems with drugs or alcohol, as far as you know? (If yes) What type?
- Did the offender have any prior arrests for nonsexual crimes, as far as you know? (If yes, describe.)

The questions determining the genders and ages of the children depicted in the child pornography asked

- Were the children depicted in the child pornography…Mostly girls? Mostly boys? About equally both sexes?
- What age groups were depicted? Were there children…Under 3 years old? 3 through 5 years old? 6 through 12 years old? 13 through 17 years old?

The questions about the nature of the child pornography **possessed** asked

- Did the child pornography include graphic sexual images? By graphic sexual images, I mean images that focused on genitals or showed explicit sexual activity.
- Did any of these images show sexual contact between an adult and child? I mean the adult was touching the child's genitals or breasts or vice versa.
- Did any of the pictures, whether or not they included an adult, show acts involving penetration of the child, including oral sex?
- Did any of the child pornography feature violence? I mean violence beyond sexual assault, such as bondage, brutal rape, or torture.
- Did any of the child pornography feature nudity or semi-nudity, but not graphic sexual images?

A copy of the detailed *N-JOV* Methodology Report is available online at the Crimes against Children Research Center web site at www.unh.edu/ccrc.

# References

Armagh, D.S. (2002). Virtual child pornography: Criminal conduct or protected speech. *Cardozo Law Review, 23*, 101-117.

Cross, T.P., Walsh, W.A., Simone, M., & Jones, L.M. (2003). Prosecution of child abuse: A meta-analysis of rates of criminal justice decisions. *Trauma, Violence & Abuse, 4* (4), 323-349.

Finkelhor, D., & Dzuiba-Leatherman, J. (1994). Children as victims of violence: A national survey. *Pediatrics, 94* (4), 413-420.

Finkelhor, D., & Ormrod, R.K. (1999). *Reporting crimes against juveniles (Juvenile Justice Bulletin)* (No. NCJ178887). Washington DC: Office of Juvenile Justice and Delinquency Prevention.

Jenkins, P. (2001). *Beyond tolerance: Child pornography on the Internet*. New York: New York University Press.

Kilpatrick, D.G., & Saunders, B.E. (1999). *Prevalence and consequences of child victimization: Results from the national survey of adolescents* (No. 93-IJ-CX-0023). Charleston, SC: U.S. Department of Justice.

Klain, E.J., Davies, H.J., & Hicks, M.A. (2001). *Child pornography: The criminal-justice system response* (No. 3-01-021). Alexandria, Virginia: American Bar Association Center on Children and the Law for the National Center for Missing & Exploited Children.

Kreston, S.S. (2004). Defeating the virtual defense in child pornography cases. 4 *J. High Tech Law 49*.

Taylor, M., Holland, G., & Quayle, E. (2001). Typology of paedophile picture collections. *The Police Journal, 74*, 97-107.

Taylor, M., & Quayle, E. (2003). *Child pornography: An Internet crime*. Hove: Brunner-Routledge.